Braxston L. BANKS, Plaintiff–Appellant,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant–Appellee.

No. 91–1666.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1991.

Decided Oct. 13, 1992.

As Amended Oct. 19, 1992.

Rehearing and Rehearing In Banc Denied Dec. 10, 1992.

Alan B. Morrison (argued), Michael Tankersley, Public Citizen Litigation Group, Washington, D.C., James A. Masters, Joseph S. Donnelly, Nemeth, Masters & Leone, South Bend, Ind., for plaintiff-appellant.

William C. Barnard (argued), Debra McVicker Lynch, Gayle A. Reindl, Sommer & Barnard, Indianapolis, Ind., John J. Kitchin, Kansas City, Mo., for defendant-appellee.

Before COFFEY and FLAUM, Circuit Judges, and GRANT, Senior District Judge.*

COFFEY, Circuit Judge.

Braxston Lee Banks appeals the district court's dismissal of his claim that the National Collegiate Athletic Association ("NCAA") rules withdrawing athletes' eligibility to participate in collegiate sports in the event the athlete chooses to enter a professional draft or engages an agent to help him secure a position with a professional team are an illegal restraint on trade or commerce in violation of 15 U.S.C. § 1. We affirm the judgment of the district

* The Honorable Robert A. Grant, Senior Judge for the Northern District of Indiana, is sitting by designation.

court holding that Banks failed to state a claim upon which relief can be granted.

## I. FACTS

Banks entered the University of Notre Dame on a full football scholarship in September of 1986. As a freshman Banks started in four or five games and in fact played in all eleven contests. In the first game of his sophomore year, Banks injured his knee and, as a result of his injury, played in only seven games—he started in four of them. Again in his junior year, allegedly because of the knee injury, Banks played in only six games but again started in four. Banks chose to sit out his senior year (1989) because, as he stated, "of my desire to be sure that my knee was fully recovered before I played again." Having completed three years of college eligibility, Banks was eligible to enter the National Football League ("NFL") selection process or "draft" in the spring of 1990. Banks decided to enter the 1990 NFL draft [1] after representatives of two scouting organizations employed by the NFL teams informed him that he would have been invited to the regular NFL scouting try-outs if he had completed his collegiate eligibility. His decision was allegedly based partially on a fear that playing another season of college football might expose him to further injury and thus prevent him from entering the pros, as well as the belief that he could anticipate being drafted because a former teammate, who was placed in the starting lineup at Notre Dame after Banks suffered a knee injury, was expected to be drafted early. After the news of Banks' entrance into the draft became public, representatives of virtually every NFL team visited Notre Dame and put him through athletic efficiency drills to test his skills. In addition, Banks participated in an NFL tryout in Indianapolis, Indiana for college players who had entered the draft before completing college eligibility. Banks apparently performed below par at the tryouts in Indianapolis, and as a result failed to be selected in the draft or as a free agent.

Under the NCAA rules, an athlete is eligible to play four seasons of an intercollegiate sport within five years of commencing his college education.[2] As a result of sitting out his senior year of eligibility, Banks had one year of intercollegiate eligibility remaining when he graduated in August of 1990.[3] Banks concluded that his failure to be picked in the NFL draft was based on the respective teams' fears that his injury made him suspect because of his previous knee injury; rather than the teams' evaluation that his playing skills did not measure up to the professional level of the NFL. In spite of the fact that he was exposing himself to further injury, he decided that the only way for him to demonstrate his ability to compete on the professional level was to return to Notre Dame for graduate courses and re-enter its intercollegiate football program during his final year of eligibility. Unfortunately for Banks, two NCAA eligibility rules stood in his way. Rule 12.2.4.2, the "no-draft" rule, provides that "[a]n individual loses amateur status in a particular sport when the individual asks to be placed on the draft list or supplemental draft list of a professional league in that sport. . . ." Rule 12.3.1, the "no-agent" rule, states: "An individual shall be ineligible for participation in an intercollegiate sport if he or she ever has agreed (orally or in writing) to be represented by an agent for the purpose of

---

1. Before a player with remaining intercollegiate eligibility enters the draft, he must sign a form stating that: "I hereby irrevocably renounce any and all remaining college eligibility I may have. I wish to be eligible for the NFL draft scheduled for April 22–23, 1990." The NCAA agrees with Banks that this statement of waiver did not prevent him from playing football at Notre Dame in the fall of 1990.

2. An athlete's eligibility to participate in NCAA sanctioned sports programs is also conditioned upon his or her meeting minimum academic requirements, i.e., the athlete's grade point average and number of semester credits. *See* 1992–93 NCAA Division I Operating Manual § 14.-3.1.1(a), (b) (Bylaw requiring high school graduates to have maintained a 2.0 high school grade point average and achieved a combined S.A.T. score of 700 (or an A.C.T. composite score of 15) to participate in intercollegiate athletics).

3. Banks completed the requirements for his B.A. in English during the summer, 1990 term.

marketing his or her athletics ability or reputation in that sport." Since Banks participated in the draft try-outs and agreed to be represented by an agent subsequent to signing up for the draft, either of the two rules (NCAA Rule 12.2.4.2 or Rule 12.3.1) was sufficient to bar him from participating in his final year of eligibility at Notre Dame. The Notre Dame football coaches allegedly wanted Banks to play in the 1990 season, but according to Banks, the school refused to request the NCAA to reinstate Banks' eligibility because no college had ever appealed to the NCAA to restore eligibility of a player who entered the NFL draft. The NCAA declined to consider Banks' personal request for reinstatement, as the bylaws provide only for member colleges to petition for restoration of an athlete's eligibility.

With Notre Dame's football season rapidly approaching (first practice August 17, 1990), Banks filed his complaint in the United States District Court for the Northern District of Indiana in South Bend on August 9, 1990. In his first cause of action Banks requested a preliminary injunction against Notre Dame and the NCAA to prevent the enforcement of the no-draft and no-agent rules; in his second cause of action, Banks sought an injunction on behalf of himself and a class of players similarly situated restraining the NCAA from enforcing the rules. The district court denied Banks' request for a preliminary injunction after a hearing. The court held that Banks had "not demonstrated a reasonable likelihood of success on his claim that the NCAA's regulations restrain trade in violation of § 1 of the Sherman Act." After the denial of his request for a preliminary injunction that would have allowed him to play during the 1990 season, Banks' hopes of reentering the Notre Dame football program evaporated because of NCAA Rule 14.2, which limits an athlete's intercollegiate eligibility to five calendar years from the date he registers as a full-time student.[4] Thereafter, Banks amended his complaint on August 30, 1990 and withdrew his request for a "preliminary injunc-

tion" and made two claims: (1) requesting that the NCAA be permanently enjoined from enforcing Rules 12.2.4 and 12.3 on behalf of the plaintiff's class (Amended Complaint, ¶¶ 30–33), and (2) treble damages from the NCAA for "the loss of his grant-in-aid worth approximately $16,000 for another year, the value of the extra year of education, and the value of another year of football eligibility at Notre Dame." (Amended Complaint, ¶ 36). Pursuant to Federal Rule of Civil Procedure 12(b)(6), the NCAA moved to dismiss Banks' complaint for failure to state a claim (the complaint stated two claims) upon which relief can be granted. In granting the NCAA's motion, the district court stated with respect to Banks' individual claim for treble damages:

"Mr. Banks argues that he has asserted a cognizable injury under the antitrust laws in the second cause of action of his amended complaint. He contends that the impact of the NCAA's rules cannot be resolved on a motion to dismiss since disposition of that issue is fact-sensitive. He suggests that the NCAA rules violate the antitrust laws by restricting opportunities in the labor market for collegiate football players. Mr. Banks further suggests that the rules effect a group boycott on the part of the NCAA and the NFL teams over collegiate football players as consumers in the labor market. *Mr. Banks does not suggest what anti-competitive effects result from either restraints in the football labor market or the group boycott;* nor does he challenge the purported pro-competitive impact of the NCAA's no draft rules."

Mem. Op. at 5–6 (Feb. 20, 1991) (emphasis added). The court held that:

"Mr. Banks' amended complaint fails to allege facts establishing the NCAA's violation of the antitrust laws. As discussed in the August 17 order, the NCAA has demonstrated significant pro-competitive effects of its no draft rules. Mr. Banks has alleged no anti-competi-

---

**4.** Since Banks entered Notre Dame as a full-time student in the fall of 1986, the 1990 season was the last year he would have been eligible to compete under Rule 14.2.

tive effects to overcome this positive impact and show an adverse market impact upon either collegiate players or NCAA member institutions. As discussed in the August order, the rules affect neither the player's ability to receive financing for their education nor the school's opportunity to compete for athletes. While Mr. Banks claims that the NCAA rules in question accomplish a group boycott by way of restricting the football labor market, *he ties those allegations to no competitive impact on any identifiable market.* Mr. Banks has no antitrust injury that can be gleamed [sic] from the amended complaint."

*Id.* at 10–11 (emphasis added).

## II. ISSUES

We will address the following issues in this appeal: 1) whether Banks has standing to act as a class representative for the purpose of seeking to enjoin the NCAA's enforcement of its no-draft and no-agent rules; 2) whether the district court erred in dismissing this antitrust claim under Rule 12(b)(6) for failure to state a claim upon which relief can be granted; and 3) whether the plaintiff stated a valid antitrust claim in his second cause of action.

## III. STANDING

▇▇▇ The NCAA asserts that since Banks' claim on behalf of the class for injunctive relief is moot as to Banks,[5] he lacks the standing necessary to create a case or controversy sufficient to invoke the jurisdiction of a federal court pursuant to Article III of the United States Constitution.[6] "One commentator has defined mootness as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *United States Parole Comm'n v. Ger-*

*aghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980) (citation omitted). A case becomes moot when the controversy between the parties is no longer live, or one of the parties lacks a personal stake in the outcome of the suit. *See id.* at 396, 100 S.Ct. at 1208. "The personal stake requirement relates to the first purpose of the case-or-controversy doctrine— limiting judicial power to disputes capable of judicial resolution." *Id.* Banks' ineligibility to participate in collegiate football because of NCAA Rule 14.2 prevents him from having a personal stake in whether the NCAA continues to enforce its no-draft and no-agent rules. Nonetheless, the mootness requirements are less stringent in the class action context, for mootness "can be avoided through certification of a class prior to expiration of the named plaintiff's personal claim." *Id.* at 398, 100 S.Ct. at 1210. Or, if the class is not certified before the named plaintiff loses his or her personal stake,

> "[w]hen the claim on the merits is 'capable of repetition, yet evading review,' the named plaintiff may litigate the class certification issue despite loss of his personal stake in the outcome of the litigation ... [but only] where the named plaintiff does have a personal stake at the outset of the lawsuit, and where the claim may rise again with respect to *that plaintiff....*"

*Id.* at 398, 100 S.Ct. at 1209 (emphasis added). The Supreme Court limited its holding in *Geraghty* "to the appeal of the denial of class certification motion. A named plaintiff whose claim expires may not continue to press the appeal on the merits until a class has been properly certified." *Id.* at 404, 100 S.Ct. at 1213. The district court never ruled on Banks' request for class certification because the parties, with the approval of the court, agreed to defer consideration of the class certifica-

---

5. Banks does not challenge the fact that his class-action claim was moot as to him personally when he filed his amended complaint, for he abandoned his quest to have his eligibility reinstated at that time.

6. The NCAA additionally argues that Banks is without antitrust standing to seek an injunction, since his alleged harm is in the past, and injunctive relief is granted to avoid future antitrust injuries. In view of our disposition of the constitutional standing issue, it is unnecessary to address whether Banks had antitrust standing.

tion issue until after the court's ruling on the NCAA's motion to dismiss. Thus, under the express terms of *Geraghty*, Banks may not seek relief for the class because the claim cannot be considered viable as Banks is no longer a member of the class, and there is no class certification ruling to appeal.

Banks argues that he may nevertheless represent the class, since he had a live claim for injunctive relief when the case was initially filed, and the claim "is of the kind that is unlikely to be able to be certified before it becomes moot." We recognize that " '[s]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.' " *County of Riverside v. McLaughlin*, — U.S. —, —, 111 S.Ct. 1661, 1667, 114 L.Ed.2d 49 (1991) (quoting *Geraghty*, 445 U.S. at 399, 100 S.Ct. at 1210). But we do not believe Banks' alleged legal injury was "so inherently transitory" as to prevent a district court from ruling on a request for class certification prior to expiration of the personal interest. Banks entered but was not selected in the NFL draft held on April 22–23, 1990, and thus had nearly 120 days between the NFL draft on April 23, 1990 and the start of Notre Dame's football practice on August 17, 1990 to bring his claim for injunctive relief. In *Trotter v. Klincar*, 748 F.2d 1177, 1184–85 (7th Cir. 1984), we rejected a claim that seventy days provided insufficient time to obtain a ruling on a motion for class certification. In this case, it was Banks' decision to wait until only eight days before his claim for injunctive relief became moot that made his claim transitory. Had Banks been diligent in filing his claim shortly after discovering that he had failed to be selected for the draft or as a free agent, and still been unable to obtain class certification, he might have been able to make an argument for the class that he had standing for the purpose of pursuing a ruling on class certification even though his own individual

claim had become moot. But under the circumstances of this case, where the district court dismissed the claim prior to ruling on Banks' request for class certification for the claim of injunctive relief, we are without jurisdiction to consider the merits of Banks' first cause of action. *See Geraghty*, 445 U.S. at 404, 100 S.Ct. at 1213. The district court should have dismissed Banks' class action claim for injunctive relief as moot.

## IV. RULE 12(b)(6) DISMISSAL OF A RULE–OF–REASON CASE

Banks' primary contention on appeal is that because the record is not thoroughly developed, it was inappropriate for the district court to decide that the NCAA no-draft and no-agent rules were pro-competitive in ruling on a Rule 12(b)(6) motion to dismiss.[7] Banks asserts that "[w]ithout any evidence, the district court agreed with the NCAA that its no-draft and no-agent Rules were reasonable and dismissed the complaint under Rule 12(b)(6) for failure to state a claim." We are unconvinced that the record in this case requires further development in order to determine whether the NCAA rules have a pro-competitive effect, but it is immaterial to evaluating Banks' argument that the district court improperly decided that the rules were reasonable. The district court decided the case not on the basis of the relative anti-competitive effect of the rules versus the pro-competitive impact, but on the ground of Banks' absolute failure to allege an anti-competitive effect: "Mr. Banks does not suggest what anti-competitive effects result from either restraints in the football labor market or the group boycott; nor does he challenge the purported pro-competitive impact of the NCAA's no draft rules." The court went on to hold that "[w]hile Mr. Banks claims that the NCAA rules in question accomplish a group boycott by way of restricting the football labor market, *he ties those allegations to no competitive impact on any identifiable*

---

**7.** The mootness of Banks' first cause of action does not affect his claim under the second cause of action for damages from his alleged injury.

*market.* Mr. Banks has no antitrust injury that can be gleamed [sic] from the amended complaint." (Emphasis added). Since the district judge's decision was based on Banks' failure to allege an anti-competitive effect on an identifiable market, the argument that the court improperly determined that the rules were reasonable on a motion to dismiss is without merit.

## V. THE VALIDITY OF THE ANTITRUST CLAIM

■ The district court dismissed Banks' claim because he failed to allege that the NCAA rules had an anti-competitive impact on any identifiable market. Banks chose to appeal the judgment of the court rather than request leave to amend and reinstate his complaint. On appeal, Banks ignores the holding of the district court and asserts that the court found an anti-competitive impact on a relevant market. Referring to the trial court's holding, Banks states:

> "In ruling on plaintiff's motion for a preliminary injunction, the district court found that plaintiff had standing to raise his antitrust claim and that he had identified a relevant market and shown an anticompetitive restraint on that market ('no-draft rule will deter better college football players from testing the waters of professional football' so that they 'will remain in school and out of the NFL draft, enhancing the NCAA's already profitable product.') Nevertheless, it ended its subsequent opinion dismissing the case with a statement that plaintiff 'has no antitrust injury that can be gleamed [sic] from the amended complaint'—but with no elaboration for this conclusion. Accordingly, our response is

based on the argument raised by the NCAA below."

The district court's conclusion that Banks "has no anti-trust injury" was obviously based upon its holding that Banks failed to allege an anti-competitive impact on a relevant market. We confess that we are somewhat perplexed as to how Banks expects to get a reversal of the district court's judgment without assigning error to its holding.[8]

The dissent claims, on the other hand, that Banks' complaint did allege an anti-competitive impact on an identifiable market. Dissent at 1094 n. *. We disagree, but we do not dispute the fact that the plaintiff could have alleged an anti-competitive impact. However, this court is not able to review what Banks could have alleged, but is called upon to review only what he actually alleged. Our review of Banks' argument shows that the plaintiff cited only examples of anti-trust law violations (group boycotts, price fixing, control of output, refusal to deal) but failed to delineate much less explain which, if any, of these restraints of trade apply to the NCAA rules at issue.[9]

This court has previously addressed the requirement of alleging anti-competitive effects on a market in order to make out a claim for a violation of the Sherman Act:

> "The fundamental requirement at issue in this dispute is that of *a sufficient allegation of anticompetitive effects that would result or have resulted from the defendants' actions; the absence of such allegations is ordinarily fatal to the existence of a cause of action.* The purpose of the Sherman Act is to rectify the injury to consumers caused by diminished competition; it is for this reason

---

8. Although we could hold that Banks' failure to argue that the district court erred in holding that his complaint did not allege an anti-competitive impact on a discernible market waived any such argument, we choose to review the complaint. Alternatively, we review the complaint because the NCAA for some reason failed to raise the defense of waiver.

9. Contrary to the dissent's view, Banks was not "compelled to address the arguments presented in the NCAA's brief ..." to allege an anti-competitive effect. Dissent at 1094 n.*. Banks was

required to allege and explain how the challenged NCAA rules have an anti-competitive impact on *the markets he describes as (1) NCAA member institutions and (2) NCAA football players who enter the draft and/or employ an agent.* Absent the plaintiff's explaining how the no-draft and no-agent NCAA rules are "classic" examples of restraints of trade in his amended complaint (¶ 22(b)), we agree with the trial court that Banks has failed to sufficiently allege an anti-competitive impact upon an identifiable market to survive the 12(b)(6) motion.

that Congress provided a treble damage recovery for private parties willing to initiate an enforcement action. Thus, the plaintiff must allege, not only an injury to himself, but an injury to the market as well. . . .

"It is only when the plaintiff adequately states a *per se* violation of § 1 of the Sherman Act that an allegation of anticompetitive effects is not required."

*Car Carriers, Inc. v. Ford Motor Company*, 745 F.2d 1101, 1107–08 (7th Cir.1984) (footnote and citations omitted) (emphasis added). Under the Supreme Court's ruling in *National Collegiate Athletic Association v. Board of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), allegations that the NCAA rules restrain trade or commerce may not be viewed as *per se* violations of the Sherman Act, but must be addressed under the "Rule of Reason." Thus, in order for Banks' complaint to state a claim upon which relief can be granted, it must allege anti-competitive effects on a discernible market. *See Hennessy Industries, Inc. v. FMC Corp.*, 779 F.2d 402, 404 (7th Cir.1985).

Banks' complaint alleged that the NCAA no-draft and no-agent rules restrained trade or commerce in three ways:

"(a) First, there is the restraint imposed by the NCAA on all of its member institutions that restricts them from offering a player such as Banks, who enters the draft and/or retains an agent, an opportunity to play college football again. The relevant market on which that restraint is imposed is all those players who wish to play football for major college football teams, a market which is dominated by the NCAA.

"(b) Second, the Rules operate as a restraint on all members of the NCAA requiring them to abide by the Rules, and not to change them or grant waivers from them. This restraint operates directly on member institutions such as Notre Dame and indirectly, although intentionally, on players such as Banks. The relevant market is all major college football institutions since all NCA [sic] member institutions are subject to similar restrictions, and hence players like

Banks are foreclosed from choosing a major college football team based on the willingness of the institution to waive or change its rules, or consider doing so.

"(c) The Rules also operate to restrain the ability of a player such as Banks from marketing his services to the NFL, by effectively giving him one and only one realistic chance to be drafted by the NFL. The relevant market being restrained is composed of players like Banks who are considering entering the NFL draft while they still have college football eligibility remaining."

These allegations identify two markets: (1) NCAA football players who enter the draft and/or employ an agent and (2) college institutions that are members of the NCAA. Another reading of the complaint might even have deduced a third market, the NFL player recruitment market. But regardless of how charitably the complaint is read, it has failed to define an anticompetitive effect of the alleged restraints on the markets.

The dissent reasons that Banks has alleged that the NCAA no-draft rule has an anti-competitive effect in the market for college football players. Dissent at 1094. The dissent claims this anti-competitive effect is the no-draft rule "foreclos[ing] players 'from choosing a major college football team based on the willingness of the institution to waive or change [the no-draft] rule[ ].'" Dissent at 1095 (quoting Amended Complaint ¶ 22(b)). This allegation can at best be described as inaccurate and further fails to allege an anti-competitive impact. First, as Banks states in ¶¶ 5–7 of his amended complaint, the NCAA has adopted the no-draft, no-agent, and other substantive rules to which all NCAA member institutions "have agreed, and do in fact, adhere." Amended Complaint ¶ 6. Contrary to Banks' erroneous allegation (¶ 22(b)), an NCAA member institution may not waive or change the no-draft rule at its discretion for it is rather obvious that only the National Collegiate Athletic Association can waive or change one of its substantive rules. 1992–93 NCAA Division I Operating Manual § 14.01.5 (Compliance With Other

NCAA and Conference Legislation). Any school that sought to waive or change the rules would forfeit its ability to participate in NCAA sanctioned events.

Second, as the district court held, the complaint has failed to allege an anti-competitive impact.[10] The failure results from Banks' inability to explain how the no-draft rule restrains trade in the college football labor market. The NCAA Rules seek to promote fair competition, encourage the educational pursuits of student-athletes and prevent commercialism. According to the constitution of the National Collegiate Athletic Association, the purposes of the NCAA Eligibility Rules are to maintain amateur intercollegiate athletics

> "as an integral part of the educational program and the athlete as an integral part of the student body and by doing so, retain a clear line of demarcation between intercollegiate athletics and professional sports.... The overriding purpose of the Eligibility Rules, thus, is not to provide the NCAA with commercial advantage, but rather the opposite extreme—to prevent commercializing influences from destroying the unique 'product' of NCAA college football."

*Gaines v. National Collegiate Athletic Ass'n*, 746 F.Supp. 738, 744 (M.D.Tenn. 1990).

As the Supreme Court in *Board of Regents* stated: "most of the regulatory controls of the NCAA [are] a justifiable means of fostering competition among the amateur athletic teams and therefore are procompetitive because they enhance public interest in intercollegiate athletics." *Board of Regents*, 468 U.S. at 104, 104 S.Ct. at 2961. The Court further explained:

> "[T]he NCAA seeks to market a particular brand of football—college football.

The identification of this 'product' with an academic tradition differentiates college football from and makes it more popular than professional sports to which it might otherwise be comparable, such as, for example, minor league baseball. *In order to preserve the character and quality of the 'product,' athletes must not be paid, must be required to attend class, and the like.* And the integrity of the 'product' cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally [restrictions on eligibility rules], its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive."

*Id.* at 102, 104 S.Ct. at 2960–61 (emphasis added, footnote omitted). The no-draft rule has no more impact on the market for college football players than other NCAA eligibility requirements such as grades, semester hours carried, or requiring a high school diploma. They all constitute eligibility requirements essential to participation in NCAA sponsored amateur athletic competition.[11] Banks might just as well have alleged that only permitting a student five calendar years in which to participate in four seasons of intercollegiate athletics restrains trade. Banks' allegation that the no-draft rule restrains trade is absurd. None of the NCAA rules affecting college football eligibility restrain trade in the market for college players because the NCAA

---

**10.** The dissent argues the no-draft rule is anticompetitive for Banks by stating: "[i]f the no-draft rule were scuttled, colleges that promised their athletes the opportunity to test the waters in the NFL draft before their eligibility expired, and returned if things didn't work out, would be more attractive to athletes than colleges that decline to offer the same opportunity." Dissent at 1094–95. Unlike the dissent, we choose not to create arguments not stated in the complaint, rather, we analyze the complaint to determine whether the complaint itself has alleged an anticompetitive impact.

**11.** "The NCAA is a private, voluntary membership organization, and, as such, any athletes participating in intercollegiate competition at its member institutions must abide by its rules to compete." Gregory J. Tarone, *Amateur Athletes and Eligibility*, 93 Case & Comment 3, 4 (May 1988).

does not exist as a minor league training ground for future NFL players but rather to provide an opportunity for competition among amateur students pursuing a collegiate education.[12] Because the no-draft rule represents a desirable and legitimate attempt "to keep university athletics from becoming professionalized to the extent that profit making objectives would overshadow educational objectives," the no-draft rule and other like NCAA regulations preserve the bright line of demarcation between college and "play for pay" football. *Id.* at 123, 104 S.Ct. at 2972 (White, J. dissenting) (citation omitted). We consider college football players as student-athletes simultaneously pursuing academic degrees that will prepare them to enter the employment market in non-athletic occupations, and hold that the regulations of the NCAA are designed to preserve the honesty and integrity of intercollegiate athletics and foster fair competition among the participating amateur college students. *Justice v. NCAA*, 577 F.Supp. 356, 382 (D.Ariz. 1983).

In order for the NCAA Rules to be considered a restraint of trade in violation of § 1 of the Sherman Act, Banks must allege that the no-draft and no-agent rules, as the dissent explains, are terms of employment that diminish competition in the employment market (i.e., college football). Dissent at 1095 (citing *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Nichols v. Spencer Int'l Press*, 371 F.2d 332, 335–36 (7th Cir.1967); Phillip Areeda and Donald F. Turner II, *Anti-trust Law*, ¶ 338(c) at

199–200 (1978)). The dissent refers to NCAA member colleges as "purchasers of labor" in the college football player market and the players as "suppliers" in this market.[13] Dissent at 1094. After likening colleges to "purchasers of labor," the dissent extends the analogy to conclude that colleges offer material terms of employment to their college players and that the no-draft rule is a "material term of employment" that harms competition in the college football labor market. Dissent at 1095–96.

Initially, we restate that the no-draft rule and similar NCAA rules serve to maintain the clear line of demarcation between college and professional football. *Board of Regents*, 468 U.S. at 104, 104 S.Ct. at 2960–61; 1991–92 NCAA Manual § 1.3.1 Basic purpose (NCAA Fundamental Policy § 1.3). In contrast to professional football, NCAA student-athletes are required to attend class, maintain a minimum grade point average, and enroll and complete a required number of courses to obtain a degree. *See* 1992–93 NCAA Division I Operating Manual §§ 14.01.1, 14.01.02, 14.01.5, 14.1.6.2.2. The no-draft rule is evidence of the academic priority of the NCAA because it forecloses a student-athlete from hiring an agent or entering the NFL draft and after failing to meet the professional standards, returning to play college football to improve his football skills in hopes of entering an upcoming draft. In denying a college football player the right to play professional football (entering the NFL draft)

---

**12.** This conclusion is buttressed by the fact that a very small number of college athletes go on to participate in professional athletics. Of the over 12,000 Division 1–A college football players, less than 300 go on to the NFL each year. NCAA Participation Study (1990–91). In fact, it has been calculated that of the elite 336 players drafted each year, only 49% make NFL teams and after 5 years only 35% are still with an NFL team.

**13.** We disagree with Banks' allegation in paragraph 22(c) of his Amended Complaint that the NCAA no-draft and no-agent Rules give the college player only one realistic chance of being drafted in the NFL because the college player (1) can enter the draft any time during his

college career (Tommy Maddox of UCLA was just drafted by Denver although he had two more years of eligibility); (2) enter the draft, then play for another league like the CFL, WFL, or ARENA or even sit out for a year and then reenter the draft (Bo Jackson was a first round draft choice of Tampa Bay, but he chose to play baseball instead, the next year he was drafted by the Los Angeles Raiders with whom he signed); or (3) complete his eligibility before entering the draft.

Recently 97 of the 107 NCAA Division 1–A football programs imposed strict guidelines on NFL scouts to prevent plucking student-athletes from colleges. Dennis Chaptman, *Coaches take a hard line on NFL Scouts*, Milwaukee Journal, Sept. 10, 1992 at C1.

and then return to college football, the no-draft rule merely serves as an NCAA eligibility requirement and precludes the existence of a college football labor market for athletes who are ineligible by NCAA standards.

Secondly, we disagree with the dissent's allegation that NCAA member schools are "purchasers of labor" as the operation of the NCAA eligibility and recruiting requirements prohibits member colleges from engaging in price competition for players. Dissent at 1095–96. We fail to understand how the dissent can allege that NCAA colleges purchase labor through the grant-in-aid athletic scholarships offered to college players when the value of the scholarship is based upon the school's tuition and room and board, not by the supply and demand for players. Elimination of the no-draft and no-agent rules would fly in the face of the NCAA's amateurism requirements. Member schools might very well be exposed to agents offering the services of their football playing clients to the highest bidder. In representing their "pro athlete" clients, the agents would in all probability attempt to bargain with the NCAA school and might very well expect the school to offer their client an attractive contract possibly involving automobiles, condominiums, and cash as compensation in contravention of the NCAA amateurism rules. Such arrangements might involve cash compensation payable only in the future after the player has completed his college eligibility and continues with an NFL club.[14] The involvement of professional sports agents in NCAA football would turn amateur intercollegiate athletics into a sham because the focus of college football would shift from educating the student-athlete to creating a "minor-league" farm system out of college football that would operate solely to improve players' skills for professional football in the NFL. We should not permit the entry of professional athletes and their agents into NCAA sports because the cold commercial nature of professional sports would not only destroy the amateur status of college athletics but more importantly would interfere with the athletes proper focus on their educational pursuits and direct their attention to the quick buck in pro sports.[15]

The no-agent and no-draft rules are vital and must work in conjunction with other eligibility requirements to preserve the amateur status of college athletics, and prevent the sports agents from further intruding into the collegiate educational system.

Although we disagree with it, the dissent's "term of employment" argument reveals how Banks *could have alleged* the manner in which the no-draft and no-agent rules have an anti-competitive impact on a relevant market. Our review of Banks' amended complaint reveals that he has not alleged that college football players are regulated under "term[s] of employment" or that players are "sell[ing] their services" to their colleges. See Phillip Areeda and Donald F. Turner II *Anti–Trust Law*, ¶ 338(c) at 199–200 (1978). Despite the failure of Banks to allege an anti-competitive impact, the dissent again goes out of its way to read into the complaint and makes an argument for Banks by contending that

---

**14.** Of course the agents usually do not donate their services, they take a sizable percentage of the package as their own compensation.

**15.** *See Ex-agent Bloom Gets Probation*, Chic. Trib., Aug. 28, 1992, at 7, Zone C (Agents Lloyd Bloom and Norby Walters represented 42 athletes in violation of NCAA rules). Walters received an 18–month prison sentence and a $25,000 fine for his role in enticing college players to sign secret contracts before their eligibility expired. Matt O'Connor, *Walters' sentence: 1½ years*, Chic.Trib., Sept. 18, 1992, Sec. 4 at 1, 6. (The U.S. District Judge commented that "there is so much money involved in the sports business, there is strong incentive to bend and break the rules.... [Walters had] total disregard for ethics and the law ... and didn't care what he did to represent top college football stars."). *See, e.g., Division I–AAA Fails at NCAA Convention*, United Press Int'l, Jan. 9, 1992, § Sports News (Proposition 47, which now permits an underclassman to use the university to inquire as to his market value in the NFL or NBA, "is dangerous ... [because] it increase[s] ... the sports agents' intrusion into the players' lives"); *NCAA lays off Michigan State*, USA Today, Oct. 4, 1991 at 3, Zone C (Michigan State asked sports agent Charles Tucker to stay away from its athletes after discovering Tucker permitted athletes to charge sporting goods in his store at no cost).

college football players are really selling their services to NCAA member colleges. It is true that some colleges have been justifiably sanctioned by the NCAA for their violations of NCAA Rules regarding cash compensation and free airline transportation between the athlete's school and home. *Justice*, 577 F.Supp. at 362 (University of Arizona); *NCAA v. Board of Regents of Univ. of Okl.*, 468 U.S. at 85, 104 S.Ct. at 2952 (University of Oklahoma); *McCormack v. National Collegiate Athletic Ass'n*, 845 F.2d 1338, 1340–41 (5th Cir. 1988) (Southern Methodist University); Rodney K. Smith, *The National Collegiate Athletic Association's Death Penalty: How Educators Punish Themselves and Others*, 62 Ind.L.J. 985 (1987); Note, *Sherman Act Invalidation of the NCAA Amateurism Rules*, 105 Harv.L.Rev. 1299, 1312–13 (1992).

The dissent takes a surprisingly cynical view of college athletics and contends that "colleges squeeze out of their players one or two more years of service" because the no-draft rule forces the player to choose between continued collegiate eligibility and entering the draft. Dissent at 1096. This description of players "selling their services" to NCAA colleges stands in stark contrast to the academic and amateurism requirements of the vast majority of college athletic programs that, in compliance with the NCAA rules and regulations,[16] are foreclosed from offering cash compensation or "non-permissible awards, extra benefits, or excessive or improper expenses not autho-

rized by NCAA legislation...." 1992–93 NCAA Division I Operating Manual §§ 14.-01.5.1 and 14.01.5.2. The fact that a minority of schools (such as the University of Houston)[17] "use" athletes rather than encourage and foster their student's academic pursuits, does not negate the fact that all NCAA member colleges encourage and require their student-athletes to carry a minimum number of semester credits and maintain a minimum grade point average equivalent to the academic program the university's non-athletic students follow.[18]

Specifically, the NCAA requires: "[t]o be eligible to represent an institution in intercollegiate athletics competition, a student-athlete shall be enrolled in at least a minimum full-time program of studies, be in good academic standing and maintain satisfactory progress toward a baccalaureate or equivalent degree." 1992–93 NCAA Division I Operating Manual § 14.01.1. The term a "full-time program of studies" in § 14.01.1 of the NCAA By-laws is defined to mean: "the student-athlete shall be enrolled in not less than 12 semester or quarter hours, regardless of the institution's definition of a minimum full-time program of studies." *Id.* at § 14.1.6.2.2. The NCAA's definition of good academic standing in § 14.01.1 is "determined by the academic authorities [of the NCAA institution] who determine the meaning of such phrases for all students of the institution...." *Id.* at § 14.4.1. Lastly, the NCAA defines the "satisfactory completion" requirement

---

**16.** The NCAA Bylaws requires student-athletes to be "in compliance with all applicable provisions of the constitution and bylaws of the association [NCAA] and all rules and regulations of the institution ... of which the institution is a member" to preserve their eligibility and thereby "represent an institution in intercollegiate athletic[ ] competition." 1992–93 NCAA Division I Operating Manual § 14.01.5 at 74.

**17.** Recently, the NCAA released the graduation rates of Division I NCAA member schools. These statistics reveal that only 14% of scholarship athletes in football graduated from the University of Houston within six years of their matriculation in 1983–84 or 1984–85. *At First: NCAA discloses date of athletes by school,* USA Today, Aug. 13, 1992, at 11C [hereinafter *NCAA Graduation Rates*]. In addition, the NCAA reported that zero percent of black football ath-

letes at the University of Houston graduated within six years of their enrollment in 1983–84 or 1984–85, whereas 33% of white football players at Houston graduated within six years of their enrollment in 1983–84 or 1984–85. Ben Brown, *Black Athletes lag behind whites in getting degrees,* USA Today, Aug. 13, 1992, at 10C.

**18.** The NCAA study revealed that 52% of all students and 51% of student-athletes graduated within six years of entering college. *See NCAA Graduation Rates* at 11C; *see also* Brian L. Porto, *Balancing Due Process and Academic Integrity in Intercollegiate Athletics: The Scholarship Athlete's Limited Property Interest in Eligibility,* 62 Ind.L.J. 1151, 1178 (1987) (citing 1985–86 Manual of the National Collegiate Athletic Association, NCAA Const. art. 5 § 1(c) at 89; art. 5 § 1(j)(6)(ii) at 94–95).

in § 14.01.1 as "a student-athlete shall maintain satisfactory progress toward a baccalaureate or equivalent degree at that institution as determined by the regulations of that institution." [19]  *Id.* at § 14.4.2.

We acknowledge that some schools adhere more faithfully to the NCAA Rules than others, but we need not reach the merits of whether the no-draft rule is a "material term of employment" as the dissent argues because Banks has failed to allege how the no-draft and no-agent rules are restraints of trade under § 1 of the Sherman Act. The most Banks alleges is that the relevant market is (1) NCAA football players who enter the draft (or employ an agent) or (2) NCAA member college institutions, and arguably a third market as the NFL player recruitment market. Beyond establishing these markets, Banks fails to illustrate how the NCAA no-draft and no-agent rule diminishes competition in those markets. We recognize that the dissent makes an anti-competitive argument, in lieu of Banks' omission in his pleadings, but in evaluating the district court's Rule 12(b)(6) dismissal, "we limit our review, as we must, to the well-pleaded allegations of the complaint." *Car Carriers,* 745 F.2d at 1107. Thus, any additional markets or anti-competitive effects upon them alleged outside the amended complaint are immaterial to our consideration of the district court's judgment. Although on review of a Rule 12(b)(6) dismissal we accept all allegations in the complaint as true, " 'a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under *some* viable legal theory.' " *Id.* at 1106 (citation omitted). The questions in regard to Banks' allegations of restraints on trade is whether

"the plaintiffs have successfully pleaded a contract, combination, or conspiracy in restraint of trade within the meaning of the Sherman Act. The pleader may not evade these requirements by merely alleging a bare legal conclusion; if the facts 'do not at least outline or adumbrate' a violation of the Sherman Act, the plaintiffs 'will get nowhere merely by dressing them up in the language of antitrust.' "

*Id.* (citation omitted).

We agree with the district court's finding that the plaintiff has failed to allege an anti-competitive effect on a relevant market; at best Banks has merely attempted to frame his complaint in antitrust language.[20] While Banks alleges a restraint on the market of college football players, college institutions who are members of the NCAA, and perhaps an NFL player recruitment market, the complaint fails to explain how these alleged restraints dimin-

---

**19.** In addition to requiring satisfactory progress toward a baccalaureate degree, the NCAA By-laws have a "percent of degree" minimum requirement for all student-athletes to be eligible for competition: "[1][a] student-athlete who is entering his or her third year of collegiate enrollment shall have completed successfully at least 25% of the course requirements in the student's specific degree program ... [; 2] a student-athlete who is entering his or her fourth year of collegiate enrollment shall have completed successfully at least 50% of the course requirements in the student's specific degree program ... [; and 3] a student-athlete who is entering his or her fifth year of collegiate enrollment shall have completed successfully at least 75% of the course requirements in the student's specific degree program." 1992–93 NCAA Manual §§ 14.5.2–14.5.2.1.

**20.** The dissent's generous and expansive reading of Banks' complaint makes the argument for him that his injury is "of the type the antitrust laws were intended to prevent and that flow from that which makes [the NCAA rules] unlawful," *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), or in other words, that Banks' injury is "attributable to the allegedly anticompetitive aspect of those rules." Dissent at 1096 (citing *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 109–10, 107 S.Ct. 484, 488–89, 93 L.Ed.2d 427 (1986)). To the contrary, Banks' alleged injury, namely the revocation of his eligibility and loss of his athletic scholarship at Notre Dame, does not "flow from" his complaint wherein he states the NCAA rules "foreclos[e players] from choosing a major college football team based on the willingness of the institution to waive or change [the NCAA rules at issue]...." Amended Complaint ¶ 22(b). Nowhere in Banks' complaint does he tie his alleged antitrust injury with the no-draft or no-agent rules' allegedly anti-competitive impact, rather he broadly concludes "the Rules operate as a restraint on all members of the NCAA...." Amended Complaint ¶ 22(b).

ish competition in or among the markets. In our review of Banks' arguments in his appellate briefs as well as our review of the oral argument, we have been unable to discern a cogent argument articulated even on appeal that the alleged restraints impose an anti-competitive effect on the alleged markets. The appellant merely claims that there is an anti-competitive effect, but he fails to explain what it is. While Banks might possibly have been able to allege an anti-competitive impact on a relevant market through a more carefully drafted complaint or an amendment to his complaint, he failed to do so. It is not for us, as appellate judges, to re-structure his complaint for him.

## VI. CONCLUSION

Since Banks' claim on behalf of the class for injunctive relief is moot as to him, and it is not so transitory so as to prevent a trial court from ruling on a motion for class certification before the claim of any named plaintiff would become moot, we hold that Banks is without standing to pursue the merits of the claim on behalf of the class. This holding is of little consequence, however, as we also hold that Banks' failure to allege an anti-competitive impact on a discernible market justified the district court's dismissal for failure to a state claim upon which relief can be granted. The appellant's argument that the district court

erred in ruling that the NCAA rules were reasonable on a motion to dismiss is without merit, for the basis of the district court's holding was that Banks failed to allege an anti-competitive effect on a market. The judgment of the district court is

AFFIRMED.

FLAUM, Circuit Judge, concurring in part and dissenting in part.

This is a "rule of reason" case brought under § 1 of the Sherman Antitrust Act, *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), and as such the panel correctly states that Braxton Banks must allege that the NCAA rules at issue harm competition in some relevant market to get his foot in the door. *Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 539 (7th Cir.1986); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106–07 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). After quoting liberally from Banks' complaint, the panel concludes that he failed to meet his burden. Granted, the complaint was drafted somewhat inelegantly, but I nonetheless believe that it defines a market and describes how the NCAA rules harm competition in that market. Accordingly, I respectfully dissent from the panel's affirmance of the district court's dismissal of Banks' second cause of action.*

---

* At the outset of its analysis, the panel charges that, on appeal, Banks "ignore[d]" the district court's holding that he failed to allege an anti-competitive impact upon an identifiable market. *See* Op. at 1087. This charge, I suggest, is mistaken. The portion of Banks' brief quoted by the panel refers to two rulings entered by the district court. The first denies Banks' motion for a preliminary injunction against the NCAA to restore his eligibility—he was declared ineligible pursuant to the no-draft and no-agent rules—to play football for Notre Dame during his final year there. *Banks v. National Collegiate Athletic Ass'n*, 746 F.Supp. 850 (N.D.Ind. 1990) ["*Banks I*"]. Banks did not appeal this ruling. Instead, he filed an amended complaint seeking a permanent injunction on behalf of a class of players (not including himself) against enforcement of the rules, and damages resulting from his ineligibility. The district court's dismissal of the amended complaint, *Banks v. National Collegiate Athletic Ass'n*, No. § 90–394 (N.D.Ind. Feb. 20, 1991) ["*Banks II*"], is the

second ruling, and the one at issue in this appeal. Banks' characterization in his brief of these two rulings is right on the money. *Banks I* found that he had "posited a credible anti-competitive effect" of the no-draft and no-agent rules, *Banks I*, 746 F.Supp. at 860, but nonetheless denied his motion for a preliminary injunction on the ground that the rules' procompetitive effects outweighed any anticompetitive effects under the rule of reason. *Id.* at 860–62. *Banks II* (the "subsequent opinion" to which Banks refers in his brief) shifted gears by dismissing Banks' amended complaint on the ground that it did not allege any anticompetitive effects. *Banks II*, slip op. at 11. The court did not, however, really explain its change of heart. Contrary to the panel's contentions, Banks did assign error to the holding of *Banks II*. *See* Pl.'s Br. at 21–27 (contending that Banks has alleged anticompetitive effects). Any confusion arises from the fact that Banks was compelled to address the arguments presented in the NCAA's

The parties agree that Banks, to survive the NCAA's motion to dismiss, must define a relevant market and allege how the challenged rules adversely affect competition in that market. *Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255, 268 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). As the NCAA concedes, Banks defined two markets in his complaint, only one of which it is necessary to address here: the nationwide labor market for college football players. *See* Amended Complaint ¶ 22(a)–(b). NCAA member colleges are the purchasers of labor in this market, and the players are the suppliers. The players agree to compete in football games sponsored by the colleges, games that typically garner the colleges a profit, in exchange for tuition, room, board and other benefits.

Banks also alleges how the NCAA rules at issue—I will focus upon the no-draft rule—harm competition in that market: they foreclose players "from choosing a major college football team based on the willingness of the institution to waive or change [the] rule[ ]." *Id.* ¶ 22(b). It is hardly a revelation that colleges fiercely compete for the most promising high school football players—the players who, incidentally, are most likely to feel constrained by the challenged rules two or three years down the line. If the no-draft rule were scuttled, colleges that promised their athletes the opportunity to test the waters in the NFL draft before their eligibility expired, and return if things didn't work out, would be more attractive to athletes than colleges that declined to offer the same opportunity. The no-draft rule eliminates this potential element of competition among colleges, the purchasers of labor in the college football labor market. It categorically rules out a term of employment that players, the suppliers of labor in that market, would find advantageous. *Cf. FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986) (considering "a horizontal agreement among ... dentists to with-

hold from their customers a particular service that they desire").

It is well settled that an agreement among employers to control a material term of employment harms competition in the labor market at issue. *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332, 335–36 (7th Cir.1967); Phillip Areeda and Donald F. Turner, II *Antitrust Law* ¶ 338c, at 199–200 (1978); Annotation, *Validity, Under the Federal Antitrust Laws (15 USC §§ 1 et seq.) of Agreements Between Employers or Employer Associations Imposing Restrictions on Employment*, 2 A.L.R. Fed. 839 (1969 and 1991 Supp.) (citing cases); *cf. Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir.1986) (conspiracy among buyers to depress prices harmful to competition). It should come as no surprise that the no-draft rule operates to the detriment of the players, and that colleges benefit from the fact that their athletes feel tied to the institution for four years. Consider, for example, athletes who are known in the vernacular as "bubble" players. These athletes are excellent competitors at the collegiate level, but for various reasons are considered less than certain NFL prospects. Bubble players who wish to market their wares in the professional market after their sophomore or junior year will forego entry into the NFL draft because, if they are not selected (or fail to join a team after being selected), the rule will prevent them from returning to college to hone their skills and try again in subsequent years. *See* Note, *Sherman Act Invalidation of the NCAA Amateurism Rules*, 105 Harv.L.Rev. 1299, 1311 (1992). The rule permits colleges to squeeze out of their players one or two more years of service, years the colleges might have lost had the ability to enter the draft without consequence to eligibility been the subject of bargaining between athletes and colleges. *See* Rhoden, *Smoke, Mirrors and Double-talk From the N.C.A.A.*, N.Y. Times, Jan. 11, 1992, at 29. The rule thereby distorts

brief below because *Banks II's* analysis of this issue was so thin.

the "price" of labor in the college football labor market to the detriment of players.

The NCAA disputes this characterization, maintaining that the no-draft rule is not "anticompetitive" as the term is employed under the Sherman Act. At the heart of its argument is the contention that "there is no price competition as such among colleges for players because the 'price,' the value of grant-in-aid, is determined by the school's tuition, room, and board, not by the supply of and demand for players." Def.'s Br. at 20. This analysis of the college football labor market is partially correct; in that market, players exchange their labor for in-kind benefits, not cash. At least ideally. *But see* Johnson, *Defense Against the NCAA*, U.S. News & World Rep., Jan. 13, 1992, at 25 (improper cash payments made to football players at Auburn University); Johnson, *Playing for Pay in Texas*, Newsweek, Mar. 16, 1987, at 32 (same at Southern Methodist University).

It is unrealistic, however, to suggest that the value of those in-kind benefits is limited solely to tuition, room and board. If this were true, the best football players would attend the most expensive private universities that would admit them, for these universities would offer, under the NCAA's analysis, the most "valuable" compensation for their services. Assuming some regional loyalties, private colleges such as Syracuse University, the University of Southern California, and Notre Dame would consistently outrecruit public colleges such as Penn State, UCLA and the University of Michigan. As anyone familiar with college football well knows, this is not the case. The reason is simple. Athletes look to more than tuition, room and board when determining which college has offered them the most attractive package of in-kind benefits. Some athletes look primarily to the reputation of a particular program or coach as a "feeder" into the NFL; others believe that the quality of a university's academic program and the commitment of the coaching staff to scholarly pursuits is more important. Some athletes look to whether a college will offer them a cushy, high-paying job during the summer or

school year; others might be attracted by state-of-the-art training facilities. And some athletes, if given the chance, would look to whether a college would allow them to enter the NFL draft and return if they did not join a professional team.

All of these things—with the exception of the last item—are "terms of employment" that currently sweeten the pot for athletes choosing among college football programs. They provide, apart from tuition, room and board, the means by which colleges, as purchasers of labor, attract and compensate their players, the suppliers of labor. That the medium of exchange is non-monetary does not alter the fact that these benefits constitute the "price" of labor in the college football market, or that the categorical elimination of one of those benefits harms competition in that market. The NCAA's protestations notwithstanding, there can be no doubt that Banks has alleged an anticompetitive effect in a relevant market.

A couple of other matters regarding the confusing and often confused issue of "antitrust injury" warrant brief attention. The panel, as well as the district court, alludes to Banks' supposed failure to allege that the NCAA rules have caused him to suffer antitrust injury. *See* Op. at 1087; *Banks II*, slip op. at 11. I respectfully suggest that Banks has satisfied this burden. Section 4 of the Clayton Act requires private plaintiffs seeking relief under the antitrust laws to demonstrate antitrust injury, *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Local Beauty Supply, Inc. v. Lamaur, Inc.*, 787 F.2d 1197, 1200–02 (7th Cir.1986), something necessary, though not sufficient, to establish antitrust standing. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 489 n. 5, 93 L.Ed.2d 427 (1986); *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1377 (7th Cir.1987). Banks cannot clear this threshold merely by showing that his injury is causally linked to the NCAA's alleged antitrust violation. Rather, he must also show that his injury is "of the

type the antitrust laws were intended to prevent and that flows from that which makes [the NCAA rules] unlawful," *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697, or, put another way, that his injury is attributable to the allegedly anti-competitive aspect of those rules. *Cargill*, 479 U.S. at 109–110, 107 S.Ct. at 488–89. The requirement, in short, compels him "to connect the injury claimed to the purposes of the antitrust laws." Areeda and Turner, VIII *Antitrust Law, supra*, ¶ 1640c, at 444.

Banks easily clears this threshold. The no-draft rule, as noted, is anticompetitive because it constitutes an agreement among colleges to eliminate an element of competition in the college football labor market. The purposes of the antitrust laws are served when employers are prevented from tampering with the employment market in this precise way. "Just as antitrust law seeks to preserve the free market opportunities of buyers and sellers of goods, so also it seeks to do the same for buyers and sellers of employment services. . . ." Areeda and Turner, II *Id.* ¶ 338c, at 199–200; *see also Quinonez v. National Ass'n of Sec. Dealers, Inc.*, 540 F.2d 824, 828 (5th Cir.1976). Banks' injury—namely, the revocation of his eligibility and consequent loss of his athletic scholarship during his final year at Notre Dame—"flows from" the precise anticompetitive aspects of the NCAA rules that he set out in his complaint.

Our discussion of antitrust injury in *Bichan v. Chemetron Corp. (In re Industrial Gas Antitrust Litigation)*, 681 F.2d 514 (7th Cir.1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983), confirms this conclusion. There, an executive terminated by a corporation charged that the corporation had participated in a horizontal conspiracy to fix prices, and that he had been fired and blacklisted for refusing to adhere to the conspiracy. We held that the executive had failed to demonstrate antitrust injury because the harm inflicted upon him by the corporation was not "inextricably related to, and caused by" the anti-competitive effect of the alleged price fixing activities in the product market. *Id.* at 515. In so holding, we distinguished *Radovich v. National Football League, supra*, and *Nichols v. Spencer Int'l Press, Inc., supra*. Both of those cases, like *Bichan*, involved antitrust suits brought by employees against their employers, but, unlike *Bichan* both considered alleged Sherman Act violations involving anticompetitive activities among employers in the *labor* market, not the *product* market. It follows, we observed, that the plaintiffs in *Nichols* and *Radovich* had demonstrated antitrust injury because "the conspiracies in both cases were intended to restrict competitive conditions in the labor market, [and] the injuries complained of, restriction of employment alternatives, were directly related to the anticompetitive restraints." *Bichan*, 681 F.2d at 517. Banks' complaint, which alleges restrictive competitive conditions in the relevant labor market, falls squarely within the rubric of *Nichols* and *Radovich*. *See generally* Frederick Woodbridge, Jr., *Employee Standing in Private Antitrust Suits: A New Element in the Balance*, 51 U.Cin.L.Rev. 878 (1982).

The NCAA also raises the issue of harm to consumers; it contends that Banks' complaint is deficient because it does not "reasonably support the inference that consumers are harmed by the operation of the no-draft and no-agent rules." Def.'s Br. at 23. Whether harm to consumers is the *sine qua non* of antitrust injury is an issue over which there is currently a split in this circuit. Some of our cases hold that a plaintiff, to satisfy the antitrust injury requirement, must demonstrate that the challenged practice causing him harm also harms consumers by reducing output or raising prices. *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir.1992); *Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir.1992). Others hold that application of the antitrust laws "does not depend in each particular case upon the ultimate demonstrable consumer effect." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 536 (7th Cir.1986); *see also Chicago Professional Sports*, 961 F.2d at 677 (Cudahy, J., concurring).

One can dispense with the NCAA's contention without choosing sides in this dispute. To see why, it is important first to identify the consumers and the market at issue in this case. By "consumers," the NCAA apparently means people who watch college football. These individuals certainly are consumers in the college football *product* market, but the market at issue here is the college football *labor* market, and the NCAA member colleges are consumers in that market. It would be counterintuitive to require Banks to demonstrate that the no-draft and no-agent rules harm the colleges, the very entities that established those rules. I doubt very strongly that the rule laid out in *Chicago Professional Sports*, to the extent it is valid elsewhere, was intended to apply in this context. Concerted action among consumers that lowers prices harms competition as much as concerted action among producers that raises prices. The distinction should be irrelevant to any discussion of antitrust injury. *See Ball Memorial Hosp.*, 784 F.2d at 1338. Professors Areeda and Turner, when discussing the right of laborers to challenge antitrust violations in the labor market, put things nicely:

> It would be perverse ... to hold that the very object of the law's solicitude and the persons most directly concerned—perhaps the only persons concerned—could not challenge the restraint.... The standing of such plaintiffs is undoubted and seldom challenged.

Areeda & Turner, II *Antitrust Law, supra*, ¶ 338c, at 200; *see also* Phillip Areeda & Louis Kaplow, *Antitrust Analysis* ¶ 148(c), at 90 (4th ed. 1988). Banks has alleged that the NCAA rules harm competition to the detriment of producers in the college football labor market, and that his injuries are directly related to that harm. This is sufficient to establish "antitrust injury" in this context. *See Bichan*, 681 F.2d at 517 (discussing *Radovich* and *Nichols*).

I add here a caveat to avert any potential misunderstandings. My point is only that Banks has properly alleged an anticompetitive effect in a relevant market and has demonstrated antitrust injury, and hence that his damages action should survive the NCAA's motion to dismiss. But this is, of course, only the first step. To ultimately prevail, Banks also must demonstrate, under the rule of reason, that the no-agent and no-draft rules, despite their anticompetitive effects, are not "justifiable means of fostering competition among amateur athletic teams and therefore procompetitive" on the whole. *Board of Regents*, 468 U.S. at 117, 104 S.Ct. at 2969. It may very well be that the no-draft and no-agent rules are essential to the survival of college football as a distinct and viable product, in which case Banks would lose. A lively debate has arisen among those who have already considered this matter. *Compare Gaines v. National Collegiate Athletic Ass'n*, 746 F.Supp. 738, 746–47 (M.D.Tenn. 1990) (NCAA rules survive rule of reason analysis) and *Banks I*, 746 F.Supp. at 860–62 (same) *with* Note, *NCAA Amateurism Rules, supra*, at 1309–12 (would find NCAA rules invalid under rule of reason). I opt not to join the fray here, for I think it unwise to weigh pro- and anticompetitive effects under the rule of reason on a motion to dismiss. *See Wilk v. American Medical Ass'n*, 895 F.2d 352, 358 (7th Cir.), *cert. denied*, 496 U.S. 927, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990) (rule of reason considers "agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business involved, the particular restraint's history, and the reasons it was imposed").

Today's decision, by holding that Banks has not alleged that the rules are anticompetitive in the first instance, deprives him of the opportunity to join this issue on remand. As I have discussed, it is difficult to reconcile this holding with a sound reading of Banks' complaint. On a broader level, I am also concerned that today's decision—unintentionally, to be sure, for it suggests that a "more artfully drafted complaint" could have alleged an anticompetitive effect in this market—will provide comfort to the NCAA's incredulous assertion that its eligibility rules are "noncommercial." *See* Def.'s Br. at 20 n. 10. The NCAA would have us believe that intercol-

legiate athletic contests are about spirit, competition, camaraderie, sportsmanship, hard work (which they certainly are) ... and nothing else. *See NCAA Constitution*, art. 3, § 1 (1986) (student-athlete is one "who engages in a particular sport for the educational, physical, mental and social benefits he derives therefrom and to whom participation in that sport is an avocation"). Players play for the fun of it, colleges get a kick out of entertaining the student body and alumni, but the relationship between players and colleges is positively noncommercial. *See* Sharon Elizabeth Rush, *Touchdowns, Toddlers, and Taboos: On Paying College Athletes and Surrogate Contract Mothers*, 31 Ariz.L.Rev. 549, 576–77, 581–82, 587–88 (1989) (discussing images of intercollegiate sports); Arthur D. Austin, *Book Review*, 58 N.Car.L.Rev. 660, 663 (1980) (discussing contemporary myth which portrays student-athletes "as students, who, in the off hours away from dedication to the books, happen to participate in organized sports"). It is consoling to buy into these myths, for they remind us of a more innocent era—an era where recruiting scandals were virtually unknown, where amateurism was more a reality than an ideal, and where post-season bowl games were named for commodities, not corporations. *See House: Don't Tax Bowls' Sponsors*, Chi. Daily L. Bull., July 29, 1992, at 1 (House of Representatives votes to block Internal Revenue Service from taxing Mobil Cotton Bowl on the approximately $1.5 million a year it receives from Mobil). On the flip side, it is disquieting to think of college football as a business, of colleges as the purchasers of labor, and of athletes as the suppliers.

The NCAA continues to purvey, even in this case, an outmoded image of intercollegiate sports that no longer jibes with reality. The times have changed. College football is a terrific American institution that generates abundant nonpecuniary benefits for players and fans, but it is also a vast commercial venture that yields substantial profits for colleges, *see, e.g., Board of Regents*, 468 U.S. at 92–94, 104 S.Ct. at 2955–57; *National Collegiate Athletic Association, Revenues and Expenses of Intercol-*

*legiate Athletic Programs* 15 (1990) (estimating that sports revenues at Division IA schools exceeds one billion dollars per year); D. Devenzio, *Rip Off U: The Annual Theft and Exploitation of Major College Revenue–Producing Athletes* 106–08 (1986) (University of Michigan football program posted a $2 million profit in 1984); Arthur D. Austin, *The Legality of Ticket Tie–Ins in Intercollegiate Athletics*, 15 U.Rich.L.Rev. 1, 1 (1980), both on and off the field. *See, e.g.,* Lee Goldman, *Sports and Antitrust: Should College Students Be Paid to Play?*, 65 Notre Dame L.Rev. 206, 206 (1990); Rush, *Touchdowns, Toddlers, and Taboos, supra*, at 553, 570; *It Pays to Win ... Or to Lose*, N.Y. Times, June 8, 1986, § 5, at 8 (during time Heisman Trophy winner Bo Jackson played football for Auburn University, annual applications increased from 4500 to 6200); Clark, *The Business of Education: Does Athletics Help or Hurt?*, Wall St.J., Aug. 26, 1985, at 25 (athletic success of Clemson University increased average amount of alumni donations). The games provide fans with entertaining contests to watch, and athletes with an opportunity to display and develop their strength, skills and character, but they are saleable products nonetheless. *Board of Regents, supra*. An athlete's participation offers all of the rewards that attend vigorous competition in organized sport, but it is also labor, labor for which the athlete is recompensed. The no-draft and no-agent rules may, ultimately, pass muster under the rule of reason. But, putting the adequacy of Banks' complaint to the side, contending that they have no commercial effect on competition in the college football labor market, or that there is no market of that type at all, is chimerical:

> The true stake is this decades-long gentleman's agreement between the NFL and the college powers-that-be that has kept all but a handful of football playing collegians from turning pro before their four-year use to their schools is exhausted. The pros get a free farm system that supplies them with well-trained, much publicized employees. The col-

leges get to keep their players the equivalent of barefoot and pregnant.

Klein, *College Football: Keeping 'em Barefoot*, Wall St.J., Sept. 4, 1987, at 15.

When confronted with the clash between soothing nostalgia and distressing reality, it is oftentimes difficult to resist the call of tennis champion Andre Agassi, who when hawking cameras off the court tells us that "image is everything." But we must remember that Agassi's domain, at least in this instance, is television. What may be true there is decidedly not under the lens of the antitrust laws. *See National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 696, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 786–88, 95 S.Ct. 2004, 2012–14, 44 L.Ed.2d 572 (1975). Having found that Banks has cleared the threshold of alleging an anti-competitive effect in a relevant market, I would reverse the district court's dismissal of his damages action and remand for further proceedings.