In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3066

JOSEPH AGNEW, et al.,

*Plaintiffs-Appellants,*

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:11-cv-00293—**Jane E. Magnus-Stinson**, *Judge.*

ARGUED JANUARY 9, 2012—DECIDED JUNE 18, 2012[*]

Before FLAUM and KANNE, *Circuit Judges*, and CHANG, *District Judge.*[**]

[*] This opinion has been circulated among all judges of this court in regular active service pursuant to Circuit Rule 40(e). No judge requested to hear this case en banc.

[**] The Honorable Edmond E. Chang, Judge of the United States District Court for the Northern District of Illinois, sitting by designation.

FLAUM, *Circuit Judge.*   Joseph Agnew and Patrick Courtney ("plaintiffs") have at least two things in common: they were both highly successful high school football players that earned scholarships to play for National Collegiate Athletic Association ("NCAA") Division I football programs, and they both suffered career-ending football injuries during their college tenures. The athletic scholarships held by plaintiffs at the time of their injuries were good for one year only, and needed to be renewed to be valid for any subsequent seasons. When plaintiffs' injuries prevented them from playing football, their scholarships were not renewed. Plaintiffs claim that two NCAA regulations—the cap on the number of scholarships given per team and the prohibition of multi-year scholarships[1]—prevented them from obtaining scholarships that covered the entire cost of their college education. These regulations, according to plaintiffs, have an anticompetitive effect on the market for student-athletes, and therefore violate § 1 of the Sherman Act. 15 U.S.C. § 1. The NCAA filed a motion to dismiss and the district court granted that motion, finding that plaintiffs failed to allege a relevant market on which the

---

[1] On February 17, 2012, a new NCAA regulation permitting multi-year scholarships became final. *See* Steve Wieberg, *Multiyear Scholarship Rule Narrowly Survives Override Vote*, USA TODAY (Feb. 17, 2012, 7:00 p.m.), http://www.usatoday.com/sports/college/story/2012-02-17/multiyear-scholarships-survives-close-vote/53137194/1. Since plaintiffs seek damages for prior actions taken by the NCAA and its member schools, the repeal of the multi-year scholarship prohibition does not render this case nonjusticiable.

NCAA's Bylaws had an anticompetitive effect. Plaintiffs appealed the dismissal. While we depart from some of the district court's reasoning, we ultimately conclude that plaintiffs' complaint did not sufficiently identify a commercial market—an obvious necessity for Sherman Act violations—and thus we affirm the district court's dismissal of plaintiffs' suit.

## I. Background

In 2006, after receiving several offers from a number of college football teams, Agnew enrolled at Rice University on an athletic scholarship. In exchange for agreeing to play football at Rice, Agnew received a year of education, room, and board at no charge. That scholarship was renewed for Agnew's second year at Rice. During his sophomore year, Agnew suffered a series of football-related injuries. The injuries, along with a coaching change at Rice, resulted in the school's decision not to renew Agnew's scholarship for his junior year. Agnew successfully appealed this decision and received one more year-long scholarship, but he was unable to acquire a scholarship for his senior year. As a result, he was forced to pay full price for the last year of his undergraduate education.

Courtney endured a similar experience. In 2009, Courtney decided to attend North Carolina A&T on full athletic scholarship to play football. As with Agnew, the scholarship was only a year long. During training camp Courtney was injured, and as a result, his scholarship was not renewed. Due to his financial circumstances and the high cost of out-of-state tuition, Courtney

was forced to transfer to a different school and pay tuition out-of-pocket.

Plaintiffs allege that their failure to acquire a scholarship equal to the full cost of obtaining a bachelor's degree is the result of the NCAA's regulation of participating schools' athletic scholarships. Plaintiffs specifically cite two NCAA bylaws (the "Bylaws") as the source of their injury: (1) the one-year scholarship limit, which prohibits NCAA member schools from offering student-athletes multi-year scholarships, 2009-10 NCAA DIVISION I MANUAL, Bylaw 15.3.3.1 (2009-10); and (2) the cap on the number of athletic scholarships a school can offer for each team in a given year, *see, e.g.,* 2009-10 NCAA DIVISION I MANUAL, Bylaw 15.5.4. According to plaintiffs, NCAA member schools compete intensely over the premier student-athletes in the country, and if the Bylaws had not been passed, schools would need to offer multi-year scholarships to stay competitive in the market for elite athletes. They assert that multi-year scholarships used to be the norm before the Bylaws went into effect. The current ban on such scholarships, they claim, forces student-athletes who do not have their scholarships renewed to pay more for their undergraduate education. Plaintiffs further contend that the limit on the number of athletic scholarships a school can offer reduces the total number of athletic scholarships offered, thus preventing some students—perhaps those that are injured but would have been offered a multi-year scholarship but for the Bylaws—from obtaining a bargained for education. Plaintiffs therefore maintain that the Bylaws violate § 1 of the Sherman Act. 15 U.S.C. § 1.

On October 25, 2010, plaintiffs filed suit against the NCAA in the United States District Court for the Northern District of California.[2] In response, the NCAA filed a motion to dismiss and a motion to transfer simultaneously. The motion to dismiss was fully briefed, but in February 2011, the Northern District of California decided not to rule on the motion and to transfer the case to the Southern District of Indiana. The parties set a schedule for rebriefing applying Seventh Circuit case law, and before the briefs were submitted, plaintiffs filed an amended complaint. The complaint alleged that the Bylaws resulted in a horizontal agreement to fix prices and reduce output, which caused a reduction of the supply of bachelor's degrees and an increase in the price for bachelor's degrees for those that did not have their scholarships renewed.

In its motion to dismiss, the NCAA argued that plaintiffs' complaint should be dismissed for three reasons: (1) it failed to identify a relevant market, a necessity for a valid Sherman Act claim; (2) it failed to allege facts sufficient to show that the NCAA injured competition in a relevant market; and (3) it failed to allege facts sufficient to show an injury as a result of anticompetitive acts committed by the NCAA. On September 1, 2011, the

---

[2] Agnew originally filed the lawsuit as a class action, but had not filed a motion to certify a class at the time of the dismissal of the claims at issue. Thus, when plaintiffs' claims were dismissed, the entire lawsuit was dismissed, since there were no other parties with legally protected interests in the litigation. *See Wiesmueller v. Kosobucki*, 513 F.3d 784, 786 (7th Cir. 2008).

district court granted the NCAA's motion to dismiss. The court held that plaintiffs failed to identify a cognizable market in which trade was improperly restrained, and that even if plaintiffs did adequately allege that there is a product market for bachelor's degrees or a labor market for student-athletes—as plaintiffs contended during oral argument—those markets are not cognizable in the context of the Sherman Act. Since the NCAA's first argument was sufficient to dismiss plaintiffs' claims, the court did not pass on the NCAA's other arguments. The district court also held that plaintiffs' claims would be dismissed with prejudice for two reasons. First, plaintiffs already had the opportunity to amend their complaint after being exposed to the NCAA's arguments in the Northern District of California, and yet they chose not to clearly identify a relevant commercial market. Second, plaintiffs did not show how they could alter their complaint to make it sufficient since, according to the district court, the markets discussed at oral argument are not cognizable under the Sherman Act. Plaintiffs have appealed the district court's decision to dismiss its claims as well as its decision to dismiss with prejudice.

## II. Discussion

Plaintiffs' suit was brought pursuant to statutory provisions found in the Sherman Act and the Clayton Act. Under § 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. Plaintiffs' civil cause of action is rooted in the Clayton Act, which states that "any person

who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained." 15 U.S.C. § 15. Plaintiffs allege that the Bylaws are a restraint on trade in the labor market for student-athletes and the product market for bachelor's degrees, and thus violated plaintiffs' statutory rights under the Sherman Act. The NCAA contends that plaintiffs' complaint did not identify any market, including a bachelor's degree or labor market, in which the Bylaws restrained trade. The NCAA further argues that even if plaintiffs' complaint did sufficiently identify a product market for bachelor's degrees or a labor market for student-athletes, those markets are not commercial, and therefore are not cognizable under the Sherman Act. If this is true, then any NCAA actions affecting those markets—to the extent that they are markets—are not subject to antitrust laws.

In reviewing the sufficiency of a complaint, we must accept all well pled facts as true and draw all permissible inferences in favor of the plaintiff. *Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011). The Federal Rules of Civil Procedure require only that a complaint provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). We have explained, however, that a complaint may be "so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under [the Federal Rules of Civil Procedure]," in

which case a dismissal of the complaint is proper. *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007). The Supreme Court has described this notice-pleading standard as requiring a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). While factual allegations must be accepted as true, legal conclusions may not be considered. *Id.* Dismissals under Rule 12(b)(6) are questions of law, and thus are reviewed de novo. *Autry v. Nw. Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998). A district court's decision to dismiss a complaint with prejudice is reviewed for abuse of discretion. *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011).

## A. Sherman Act Framework

The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition. *Banks v. NCAA*, 977 F.2d 1081, 1087 (7th Cir. 1992). "Thus, the plaintiff must allege, not only an injury to himself, but an injury to the market as well." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984). Accordingly, a plaintiff must prove three elements to succeed under § 1 of the Sherman Act: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993). There is no question that all NCAA member schools have agreed to abide by the

Bylaws; the first showing of an agreement or contract is therefore not at issue in this case.

The district court's dismissal of plaintiffs' claims focused solely on the second necessary showing—whether there has been an unreasonable restraint of trade in a relevant market. The court did not ultimately reach the question of whether the restraints were reasonable, since it found that plaintiffs did not allege a relevant market on which a restraint of trade could operate. Most § 1 cases focus not on whether a relevant market exists, but on the other aspect of the second required showing— whether a restraint of trade in a given market was actually unreasonable. While our central discussion will revolve around whether a relevant market was—or even could have been—identified in plaintiffs' complaint, a brief explanation of how courts determine if restraints are unreasonable will be helpful in understanding why plaintiffs are mistaken in their belief that a relevant market need not be identified at all in this case.

Since the Sherman Act is meant to protect the benefits of competition, the determination of whether a restraint is unreasonable must focus on "the competitive effects of challenged behavior relative to such alternatives as its abandonment or a less restrictive substitute." Phillip Areeda, *Antitrust Law* ¶ 1500, at 362-63 (1986). Courts have established three categories of analysis—per se, quick-look, and Rule of Reason—for determining whether actions have anticompetitive effects, though the methods often blend together. *Cal. Dental Ass'n. v. FTC*, 526 U.S. 756, 779 (1999) ("The truth is that our categories

of analysis of anticompetitive effect are less fixed than terms like '*per se*,' 'quick look,' and 'Rule of Reason' tend to make them appear."); *see also United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993). All of these methods of analysis are meant to answer the same question: "whether or not the challenged restraint enhances competition." *Cal. Dental*, 526 U.S. at 780; *NCAA v. Bd. of Regents*, 468 U.S. 85, 104 (1984).

The standard framework for analyzing an action's anticompetitive effects on a market is the Rule of Reason. *Cf. Chicago Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 673 (7th Cir. 1992). Under a Rule of Reason analysis, the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area. *See Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006). As a threshold matter, a plaintiff must show that the defendant has market power—that is, the ability to raise prices significantly without going out of business—without which the defendant could not cause anticompetitive effects on market pricing. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987). If the plaintiff meets his burden, the defendant can show that the restraint in question actually has a procompetitive effect on balance, while the plaintiff can dispute this claim or show that the restraint in question is not reasonably necessary to achieve the procompetitive objective. Areeda, *Antitrust Law*, ¶1507b, at 397 (1986).

The second framework utilized by courts—the per se rule—is employed when a "practice facially appears to

be one that would always or almost always tend to restrict competition and decrease output." *Bd. of Regents*, 468 U.S. at 100 (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979)). Restraints that would fall under this category are illegal as a matter of law for reasons of efficiency; in essence, it is simply not worth the effort or resources of a Rule of Reason analysis when "the Court [can] predict with confidence that the Rule of Reason will condemn [a restraint]." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990) (quoting *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344 (1982)). Under the per se framework, a restraint is deemed unreasonable without any inquiry into the market context in which the restraint operates. *Bd. of Regents*, 468 U.S. at 100. Horizontal price fixing and output limitation are classic examples of behavior that is considered anticompetitive per se. *Id*.

The third framework is the "quick-look" analysis, which is used where the per se framework is inappropriate, but where "no elaborate industry analysis is required to demonstrate the anticompetitive character of . . . an agreement," and proof of market power is not required. *Bd. of Regents*, 468 U.S. at 109 (quoting *Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978)). Put another way, the quick-look approach can be used when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets," *Cal. Dental*, 526 U.S. at 770, but there are nonetheless reasons to examine potential

procompetitive justifications. *See* Herbert Hovenkamp, *Antitrust Law*, ¶ 1911c, at 273 (1998). Among other situations, the quick-look approach is used when a restraint would normally be considered illegal per se, but "a certain degree of cooperation is necessary if the [product at issue] is to be preserved." *Bd. of Regents*, 468 U.S. at 117; *see also* Hovenkamp, *Antitrust Law*, ¶ 1911c, at 274 (1998). Under this approach, if no legitimate justifications for facially anticompetitive behavior (such as price-fixing) are found, no market power analysis is necessary and the court "condemns the practice without ado." *Chicago Prof'l Sports*, 961 F.2d at 674. But if justifications are found, a full Rule of Reason analysis may need to take place. *Cf. Chicago Prof'l Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 600 (7th Cir. 1996).

Plaintiffs contend that the third framework—the quick-look approach—is the appropriate method for analyzing whether the NCAA's actions have had an anticompetitive effect on a commercial market. This argument finds support in *Board of Regents*, where the Supreme Court held that since college athletics is "an industry in which horizontal restrictions on competition are essential if the product is to be available at all," it is inappropriate to apply a per se rule to NCAA regulations, even if they amount to horizontal price fixing and output limitation. 468 U.S. at 100-01; *accord Chicago Prof'l Sports*, 961 F.2d at 674. According to plaintiffs, the NCAA's restriction on the number of scholarships a school can provide is a clear limitation on output (that is, the number of scholarships and, therefore, bachelor's degrees) and the NCAA's restriction of scholarships to

one year is a clear limitation on price (that is, the price of bachelor's degrees and the cost that schools must pay for student-athletes). They therefore argue that despite the inapplicability of per se rule cases, a quick-look approach is warranted in this case, as it was in *Board of Regents*. Plaintiffs next argue that the quick-look framework absolves them of the burden of describing a relevant market on which the Bylaws have had an anticompetitive effect. The Supreme Court, in *Board of Regents*, stated that "when there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required," and "naked restraint[s] on price and output require[] some competitive justification even in the absence of a detailed market analysis." 468 U.S. at 109-10 (internal quotation marks and citation omitted); *see also Law v. NCAA*, 134 F.3d 1010, 1020 (10th Cir. 1998) ("Under a quick look Rule of Reason analysis, anticompetitive effect is established, even without a determination of the relevant market, where the plaintiff shows that a horizontal agreement to fix prices exists . . . .").

Out of context, while these quotations seem to support plaintiffs' view of the quick-look doctrine, they are misleading. The quotes from *Board of Regents* and *Law* are not referring to the need for a relevant market to exist, but rather to the plaintiff's burden of showing that an agreement had anticompetitive effects on a particular market. As noted above, a plaintiff's threshold burden under the Rule of Reason analysis involves the showing of a precise market definition in order to demonstrate that a

defendant wields market power, which, by definition, means that the defendant can produce anticompetitive effects. *See Valley Liquors, Inc.*, 822 F.2d at 666. The quick-look doctrine permits plaintiffs to forgo any strict showing of market power, and thus a specific definition of the relevant market. *See Law*, 134 F.3d at 1020 ("[W]here a practice has obvious anticompetitive effects—as does price-fixing—there is no need to prove that the defendant possesses market power."). This does not mean, however, that there need not be a relevant market on which actions have an anticompetitive effect. The entire point of the Sherman Act is to protect competition in the commercial arena, *Banks*, 977 F.2d at 1087; without a commercial market, the goals of the Sherman Act have no place. If a plaintiff can show that a defendant has engaged in naked restrictions on price or output, he can dispense with any showing of market power until a procompetitive justification is shown—but the existence of a relevant market cannot be dispensed with altogether. *Cf. Law*, 134 F.3d at 1020. It is the existence of a commercial market that implicates the Sherman Act in the first instance.[3]

---

[3] Aside from the fact that the plaintiffs misunderstand the need for the existence of a relevant market, it is unclear why they would adamantly seek to avoid the topic of market power. This appears to be a clear monopsony case, since the NCAA is the only purchaser of student athletic labor. In any event, a showing of market power is not necessary in a case involving clear restrictions on price and output unless and

(continued...)

The stage is therefore set. To succeed in its challenge of the district court's dismissal, plaintiffs must prove two points: (1) that there is a cognizable market on which the NCAA's actions could have had anticompetitive effects (thus implicating the Sherman Act); and (2) that plaintiffs did, in fact, identify that market in their complaint.[4]

## B. Applicability of the Sherman Act to NCAA's Bylaws

The district court held that the bachelor's degree market and the student-athlete labor market, to the

---

[3] (...continued)
until a full Rule of Reason analysis takes place. *See Bd. of Regents*, 468 U.S. at 109-10.

[4] Of course, plaintiffs must show more than this to actually progress past the motion-to-dismiss stage. As stated *supra*, a successful Sherman Act plaintiff must prove the existence of "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina*, 8 F.3d at 1220. It is unquestionable that the member schools of the NCAA agreed to follow the NCAA's Bylaws, thus meeting the first element of a Sherman Act claim. Since the district court concluded that plaintiffs did not identify a relevant market in their complaint, it did not address whether plaintiffs adequately alleged that the Bylaws are an unreasonable restraint of trade or that they suffered an accompanying injury. Likewise, we need not analyze plaintiffs' assertions regarding the reasonableness of the NCAA's restraints or plaintiffs' alleged injury, since we ultimately conclude that plaintiffs failed to allege a relevant market in their complaint.

extent that they exist at all, could never be cognizable markets under the Sherman Act regardless of the clarity of plaintiffs' complaint. First, the district court found that we foreclosed any possibility that a labor market for student-athletes could be cognizable in *Banks v. NCAA*, 977 F.2d 1081 (7th Cir. 1992). The district court went on to reject the possibility of a cognizable market for bachelor's degrees, finding two points to be particularly relevant: (1) that one cannot buy a bachelor's degree outright, but rather must meet certain requirements to receive the degree even after tuition has been paid; and (2) that student-athletes are not given bachelor's degrees for playing sports, but rather are given the opportunity to fulfill certain requirements that could lead to the bestowal of a bachelor's degree. Plaintiffs challenge the district court's findings.

It is undeniable that a market of some sort is at play in this case. A transaction clearly occurs between a student-athlete and a university: the student-athlete uses his athletic abilities on behalf of the university in exchange for an athletic and academic education, room, and board. As the Supreme Court made clear long ago, however, the Sherman Act was intended for, and thus only applies to, commercial transactions. *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 492-93 (1940). *See also Brown*, 5 F.3d at 665 ("It is axiomatic that section one of the Sherman Act regulates only transactions that are commercial in nature."); Areeda & Hovenkamp, *Antitrust Law*, ¶260b, at 250 (2000). In determining whether the exchange of free or reduced-rate education for athletic participation constitutes a cognizable market, then, we

must determine whether such a transaction can be considered commercial. To begin with, the NCAA is not exempt from the strictures of the Sherman Act merely because it is a nonprofit entity, as *Board of Regents* makes clear. *See* 468 U.S. at 100. There is no clear line as to what constitutes a "commercial transaction," but one leading commentator has suggested that "today the term 'commerce' is much broader than it was [in the past] . . ., including almost every activity from which [an] actor anticipates economic gain." Areeda & Hovenkamp, *Antitrust Law*, ¶260b, at 250 (2000).

The Sherman Act clearly applies to at least some of the NCAA's behavior. *See Bd. of Regents*, 468 U.S. 85; *see also Law,* 134 F.3d 1010 (holding that the Sherman Act applies to the NCAA's regulation of the salaries of coaches). The question for us, however, is whether and when the Sherman Act applies to the NCAA and its member schools in relation to their interaction with student-athletes. The Supreme Court has not weighed in on this issue directly, but *Board of Regents*, the seminal case on the interaction between the NCAA and the Sherman Act, implies that *all* regulations passed by the NCAA are subject to the Sherman Act. 468 U.S. at 117. In *Board of Regents*, the Supreme Court ruled that the NCAA's restrictions on televising football games were a violation of § 1 of the Sherman Act. In so holding, the Court stated the following:

> It is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams

and therefore procompetitive because they en-
hance public interest in intercollegiate athletics. The
specific restraints on football telecasts that are chal-
lenged in this case do not, however, fit into the
same mold as do rules defining the conditions of the
contest, the eligibility of participants, or the manner
in which members of a joint enterprise shall share
the responsibilities and the benefits of the total ven-
ture.

*Id*. This presumes the applicability of the Sherman Act
to NCAA bylaws, since no procompetitive justifications
would be necessary for noncommercial activity to
which the Sherman Act does not apply. Nonetheless,
courts have struggled with the applicability of the
Sherman Act to NCAA regulations.

Specifically, the Third and Fifth Circuits have con-
fronted the issue at hand. The Third Circuit decided
the issue definitively, but limited its holding to the
NCAA's eligibility rules. *See Smith v. NCAA*, 139 F.3d 180
(3d Cir. 1998). In *Smith*, the Third Circuit upheld
the dismissal of a suit claiming that an NCAA bylaw
"prohibiting a student-athlete from participating in
intercollegiate athletics while enrolled in a graduate
program at an institution other than the student-
athlete's undergraduate institution" violated the
Sherman Act. *Id*. at 182. The court first held that the
NCAA's eligibility rules are not related to the NCAA's
commercial interests, and thus the Sherman Act does
not apply to the NCAA's promulgation of such rules. *Id.*
at 185-86; *see also Gaines v. NCAA*, 746 F.Supp. 738, 743-

44 (M.D. Tenn. 1990) (distinguishing between the NCAA's commercial rules and noncommercial rules, and finding that eligibility rules are of the latter type, and thus not subject to the Sherman Act). In an alternative holding, the Third Circuit also reasoned that even if the NCAA's actions were subject to the Sherman Act, the plaintiff's suit should have been dismissed based on a Rule of Reason analysis. *Smith*, 139 F.3d at 186. The court observed that NCAA eligibility rules "allow for survival of the product, amateur sports, and allow for an even playing field," thus making them procompetitive on balance. *Id.* at 187. Contrary to the Third Circuit, the Fifth Circuit assumed without deciding that the Sherman Act applies to the NCAA's promulgation of eligibility rules in *McCormack v. NCAA*. 845 F.2d 1338, 1343-44 (5th Cir. 1988). The Fifth Circuit nonetheless ruled that a particular NCAA eligibility rule—the restriction on benefits awarded to student-athletes— easily survived a Rule of Reason analysis, even at the dismissal stage. *Id*. As in *Smith*, the Fifth Circuit cited the eligibility rules' ability to create the product of college football, preserve that product, and preserve "a mixture containing some amateur elements." *Id*. at 1344-45.

While this Circuit has not definitively decided whether a cognizable market exists between universities and student-athletes under the Sherman Act, our case of *Banks v. NCAA* included a discussion of the issue in the form of dicta found in the majority opinion (Coffey and Grant, JJ.) and in a partial concurrence and dissent (Flaum, J.). *See generally* 977 F.2d 1081. In *Banks*, a former University of Notre Dame football player challenged

the NCAA's rule barring any players who have hired an agent or entered a professional draft. *Id*. at 1082. The majority held that the plaintiff's complaint failed to allege an anticompetitive effect on a relevant market, and thus affirmed the district court's dismissal of the plaintiff's claim. *Id.* at 1093 ("[W]e need not reach the merits of whether the no-draft rule is a 'material term of employment' as the dissent argues because Banks has failed to allege how the no-draft and no-agent rules are restraints of trade . . . ."). In dicta, the majority determined that even if the plaintiff had properly alleged anticompetitive effects of the NCAA bylaw in question, his claim would have failed. *Id.* at 1090-91. The opinion reasoned that the no-draft and no-agent bylaws were both eligibility requirements, which are essential to preserving the existence of a football league consisting of student-athletes as well as maintaining a clear line of demarcation between college sports and professional sports. *Id*. at 1089-90. Further, the majority expressed doubt that a labor market for NCAA athletes exists at all, since "the value of [a] scholarship is based upon the school's tuition and room and board, not by the supply and demand for players." *Id*. at 1091. The dissent, conversely, believed that the plaintiff had alleged anticompetitive effects on the nationwide labor market for college football players, a market that is cognizable under the Sherman Act, and that a view of the NCAA's eligibility rules as noncommercial was "an outmoded image of intercollegiate sports that no longer jibes with reality." *Id*. at 1095, 1099 (Flaum, J., dissenting). Successful college football programs often lead to

large profits, and to acquire those profits, schools must pay in-kind benefits, namely, grant-in-aid, access to training facilities, and instruction from premier coaching. *Id*. at 1096, 1099. Significantly, the dissent noted that the no-agent and no-draft rules are not necessarily Sherman Act violations, but believed that the plaintiff's complaint should have survived a motion to dismiss, and the procompetitive justifications of the eligibility rules at stake should have been examined more closely. *Id*. at 1098.

We start with the view that the Sherman Act applies to the NCAA bylaws generally. As indicated above, the Sherman Act applies to commercial transactions, and the modern definition of commerce includes "almost every activity from which [an] actor anticipates economic gain." Areeda & Hovenkamp, *Antitrust Law*, ¶260b, at 250 (2000). No knowledgeable observer could earnestly assert that big-time college football programs competing for highly sought-after high school football players do not anticipate economic gain from a successful recruiting program. Despite the nonprofit status of NCAA member schools, the transactions those schools make with premier athletes—full scholarships in exchange for athletic services—are not noncommercial, since schools can make millions of dollars as a result of these transactions.[5] Indeed, this is likely one reason that

---

[5] To illustrate, *Forbes* reported that the University of Texas' college football team was worth $129 million in 2011 and

(continued...)

some schools are willing to pay their football coaches up to $5 million a year rather than invest that money into educational resources. *See* Kristin DeRamus et al., *College Football Coach Salary Database, 2006-2011*, (Nov. 17, 2011 11:02 AM), USA TODAY, http://www.usatoday.com/sports/ college/football/story/2011-11-17/cover-college-football-coaches-salaries-rise/51242232/1 (putting top salary for a college head football coach at roughly $5.2 million). That is not to suggest that all universities with a football program are solely driven by economic benefit; the profits derived from athletics can aid a university in many positive ways that fall in line with the mission of the university as a whole. But that does not prevent many universities, through their football teams, from entering the recruiting market, setting their recruiting budget, and making recruiting decisions with economic interests in mind. Similarly, student-athletes contemplating scholarship offers likely include economic factors in their decision-making process, such as the value of a given degree or the increased potential for entry into professional football. It follows that the NCAA's bylaws can have an anticompetitive or a procompetitive effect on collegiate athletics generally and the national college football recruiting market specifically, and those effects can have an economic component.

---

[5] (...continued)

generated $71 million in profits. Chris Smith, *College Football's Most Valuable Teams*, FORBES (Dec. 22, 2011, 11:43 a.m.), http://www.forbes.com/sites/chrissmith/2011/12/22/college-footballs-most-valuable-teams/.

Thus, the transactions between NCAA schools and student-athletes are, to some degree, commercial in nature, and therefore take place in a relevant market with respect to the Sherman Act. *See White v. NCAA*, CV 06-999-RGK (C.D. Cal. Sept. 20, 2006) (holding that under the Sherman Act, "Major College Football" is a relevant market in which "colleges and universities compete to attract prospective student-athletes").

None of this is to suggest that all NCAA bylaws, or even *any* NCAA bylaws, are violative of the Sherman Act. On the contrary, *Board of Regents* implies that the Sherman Act does apply to NCAA regulations, but most regulations will be a "justifiable means of fostering competition among amateur athletic teams," and are therefore procompetitive. 468 U.S. at 117. In fact, the Supreme Court seemed to create a presumption in favor of certain NCAA rules when it stated:

> It is reasonable to assume that most of the regulatory controls of the NCAA are . . . procompetitive because they enhance public interest in intercollegiate athletics. The specific restraints . . . that are challenged in this case do not, however, fit into the same mold as do rules defining the conditions of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture.

*Id.* We construe this language as a license to find certain NCAA bylaws that "fit into the same mold" as those discussed in *Board of Regents* to be procompetitive "in the twinkling of an eye," *Bd. of Regents*, 468 U.S. at 110 n.39

(citation and quotation marks omitted)—that is, at the motion-to-dismiss stage. *See Am. Needle v. N.F.L.*, 130 S.Ct. 2201, 2216-17 (2010) (observing that certain agreements between members of a joint venture are "likely to survive the Rule of Reason" such that they do not require "a detailed analysis," and thus the Rule of Reason "can . . . be applied in the twinkling of an eye"). Thus, the first— and possibly only—question to be answered when NCAA bylaws are challenged is whether the NCAA regulations at issue are of the type that have been blessed by the Supreme Court, making them presumptively procompetitive. We now turn to that question.

The parties disagree on the scope of the presumption favoring certain NCAA regulations. Plaintiffs argue that the presumption should be limited to NCAA eligibility rules. They distinguish *Banks*, *Smith*, and *McCormack* on the grounds that the regulations upheld in those cases, unlike the regulations here, were eligibility rules. *See Banks*, 977 F.2d 1081 (suggesting in dicta that procompetitive justifications for NCAA eligibility rules would undoubtedly outweigh any anticompetitive effects if the Sherman Act does, in fact, apply to said rules); *Smith*, 139 F.3d 180 (same); *McCormack*, 845 F.2d at 1345 (reasoning at the motion to dismiss stage that "[t]he eligibility rules create the product and allow its survival in the face of commercializing pressures," and thus "do not violate the antitrust laws"). The NCAA, on the other hand, argues that the procompetitive presumption should not be limited to eligibility rules. Despite the Fifth Circuit's clear conceptualization of the limitation on collegiate athlete compensation as an eligibility rule, *see McCormack*, 845

F.2d at 1343, the NCAA argues that the regulation at issue in *McCormack* is better characterized as a financial aid rule, similar to the Bylaws at issue in this case. It therefore argues that any procompetitive presumption that might have been at play in *McCormack* should apply here.

In considering the parties' arguments and attempting to discern the scope of the presumption established by *Board of Regents*, it is important to consider the context in which that presumption was discussed. Directly preceding the language that allegedly establishes the presumption is a reminder that the NCAA's collusive behavior is only permissible because "a certain degree of cooperation is necessary if the type of competition that [the NCAA] and its member institutions seek to market is to be preserved." *Bd. of Regents*, 468 U.S. at 117. The Supreme Court made this point in greater detail in a separate section of its opinion, where it explained why "horizontal restraints on competition are essential if the product [of collegiate sports] is to be available at all." *See id.* at 98-105. The Court explained that any league sport will require the joint establishment of certain rules, such as the "size of the field" or the "number of players on a team." *Id*. at 101. College football, the court reasoned, requires even more joint activity, since

> the NCAA seeks to market a particular brand of football—college football. The identification of this "product" with an academic tradition differentiates college football from and makes it more popular than professional sports to which it might otherwise be

comparable, such as, for example, minor league base-
ball. In order to preserve the character and quality
of the "product," athletes must not be paid, must
be required to attend class, and the like. And the
integrity of the "product" cannot be preserved except
by mutual agreement; if an institution adopted
such restrictions unilaterally, its effectiveness as a
competitor on the playing field might soon be de-
stroyed. Thus, the NCAA plays a vital role in
enabling college football to preserve its character, and
as a result enables a product to be marketed which
might otherwise be unavailable.

*Id.* at 101-02. Herein lies the scope of the procompeti-
tive presumption for certain NCAA regulations. A certain
amount of collusion in college football is permitted
because it is necessary for the product to exist. Accord-
ingly, when an NCAA bylaw is clearly meant to help
maintain the "revered tradition of amateurism in college
sports" or the "preservation of the student-athlete in
higher education," the bylaw will be presumed
procompetitive, since we must give the NCAA "ample
latitude to play that role." *Id.* at 120. But if a regulation
is not, on its face, helping to "preserve a tradition that
might otherwise die," either a more searching Rule of
Reason analysis will be necessary to convince us of its
procompetitive or anticompetitive nature, or a quick
look at the rule will obviously illustrate its anticompeti-
tiveness. *See id.* In *Board of Regents*, for instance, the Su-
preme Court ruled that the limitation on the type of
television contracts that member schools are allowed to
enter into does not aid in the preservation of amateurism

or student-athletes, and is thus a violation of the Sherman Act. *Id*. The Court rejected the argument that the television plan equalized competition on the field and reasoned that, in any event, "the NCAA imposes a variety of other restrictions designed to serve amateurism which are much better tailored to the goal of competitive balance . . . [and] which are 'clearly sufficient' to preserve competitive balance to the extent it is within the NCAA's power to do so." *Id*. at 117-20.

Most—if not all—eligibility rules, on the other hand, fall comfortably within the presumption of procompetitiveness afforded to certain NCAA regulations, as both parties agree.[6] Beyond the obvious fact that the Supreme Court explicitly mentioned eligibility rules as a type that "fit[s] into the same mold" as other procompetitive rules, they are clearly necessary to preserve amateurism and the student-athlete in college football. Indeed, they define what it means to be an amateur or a student-athlete, and are therefore essential to the very existence of the product of college football. *Accord Banks*, 977 F.2d at 1089-90 ("[T]he no-draft rule and other like NCAA regulations preserve the bright line of demarcation between college and 'pay for play' football."); *Smith*, 139 F.3d at 187 ("[T]he NCAA's eligibility rules allow for the survival of the product, amateur sports, and allow for an even playing field."); *McCormack*, 845 F.2d at 1344-45 ("The

---

[6] We need not touch upon the debate of whether all eligibility rules or just *most* eligibility rules are due a presumption, as the Bylaws at issue in this case are not, in fact, eligibility rules.

NCAA markets college football as a product distinct from professional football. The eligibility rules create the product and allow its survival in the face of commercializing pressures."). There may not be such a thing as a student-athlete, for instance, if it was not for the NCAA rules requiring class attendance, and thus no "detailed analysis," *Am. Needle*, 130 S.Ct. at 2216-17, would be necessary to deem such rules procompetitive. *Cf. Bd. of Regents*, 468 U.S. at 102. The same goes for bylaws eliminating the eligibility of players who receive cash payments beyond the costs attendant to receiving an education—a rule that clearly protects amateurism. *Cf. McCormack*, 845 F.2d 1338.[7]

The Bylaws at issue in this case, however, are not eligibility rules, nor do we conclude that they "fit into the same mold" as eligibility rules. *See In re NCAA I-A Walk-on Football Players Litigation*, 398 F.Supp.2d 1144, 1149 (W.D.Wash. 2005) (finding that the cap on the number of scholarships a college team can grant does not implicate student-athlete eligibility "in the same manner as rules requiring students to attend class or rules revoking eligibility for entering a professional draft"). These Bylaws—a one-year limit to scholarships and a limit on scholar-

---

[7] One should not mistake the analysis we discuss here as requiring proof of the procompetitive nature of the NCAA's "no payment" rules on a case-by-case basis. This analysis involves a determination of whether a rule is, on its face, supportive of the "no payment" and "student-athlete" models, not whether "no payment" rules are themselves procompetitive—under *Board of Regents*, they clearly are.

ships per team—are not inherently or obviously necessary for the preservation of amateurism, the student-athlete, or the general product of college football. Issuing more scholarships (thus creating more amateur players) and issuing longer scholarships cannot be said to have an obviously negative impact on amateurism. Nor is there an obvious effect on the ability of college football to survive without the Bylaws in question. The NCAA argues that multi-year scholarships would make it too difficult for less wealthy schools to compete in the re-cruiting market, but this claim is weakened by the fact that the restriction on multi-year scholarships was only instituted in 1973, Zachary Stauffer, *NCAA Approves New Rules—But Do They Matter?*, FRONTLINE (Oct. 28, 2011, 4:58 p.m.), http://www.pbs.org/wgbh/pages/frontline/ sports/money-and-march-madness/ncaa-approves-new-rules-but-do-they-matter/, and has recently been rescinded, *see* Steve Wieberg, *supra.* In any event, the claim is far too great a leap to make without evidentiary proof at the full Rule of Reason stage. Similarly, the rules limiting the number of scholarships available for every NCAA team may have procompetitive effects, such as the pre-vention of elite programs stockpiling athletes, but it is not intuitive that the recruiting market would be unable to handle this potential pitfall on its own. The Bylaws at issue, especially the prohibition against multi-year scholarships, seem to be aimed at containing university costs, not preserving the product of college football, though evidence presented at a later stage could prove that the Bylaws are, in fact, key to the survival of the student-athlete and amateurism.

It is true that the prohibition against multi-year scholar-ships is, in a sense, a rule concerning the amount of payment a player receives for his labor, and thus may seem to implicate the split between amateur and pay-for-play sports. After all, student-athletes are paid, but their payment is limited to reimbursement for costs attendant to receiving an education. For the purposes of college sports, and in the name of amateurism, we consider players who receive nothing more than educational costs in return for their services to be "unpaid athletes." It is for this reason, though, that the prohibition against multi-year scholarships does not implicate the preservation of amateurism, for whether or not a player receives four years of educational expenses or one year of educational expenses, he is still an amateur. It is not until payment above and beyond educational costs is received that a player is considered a "paid athlete." The NCAA could (but does not) argue that payment of more than one year's educational costs for only one year of athletic services—a scenario that may unfold if a player with a multi-year scholarship is released from the team or injured—would result in the destruction of amateurism. Once again, this assertion is belied by the fact that multi-year scholarships were wholly permissible before 1973, *see* Zachary Stauffer, *supra*, and amateurism, by all accounts, was alive and well in college sports in the first seven decades of the twentieth century. *See, e.g.,* Mechelle Voepel, *College athletes are already getting paid*, ESPN.COM (July 18, 2011), http://sports.espn.go.com/ncaa/columns/story?columnist=voepel_mechelle&id=6739971.

As for the NCAA's argument that, according to *McCormack*, both eligibility rules *and* financial aid rules are deserving of a procompetitive presumption, we disagree. The NCAA's limitation on athlete compensation *beyond* educational expenses, which was implicated in *McCormack*, directly advances the goal of maintaining a "clear line of demarcation between intercollegiate athletics and professional sports," *Banks*, 977 F.2d at 1089 (quoting *Gaines*, 746 F.Supp. at 744), and thus is best categorized as an eligibility rule aimed at preserving the existence of amateurism and the student-athlete. The Bylaws at issue in this case, on the other hand, are not directly related to the separation of amateur athletics from pay-for-play athletics, as explained in the preceding paragraphs. Nor do they help preserve the existence of the student-athlete (as a facial matter, anyway), since they actually limit the number of athletes awarded financial aid and the amount of financial aid that an athlete can be awarded. Thus, financial aid rules do not always assist in the preservation of amateurism or the existence of student-athletes, so the regulations at issue cannot be presumptively procompetitive simply because they relate to financial aid.

The lack of a procompetitive presumption in favor of the two Bylaws under consideration does not equal a finding that they are anticompetitive; it simply means that they cannot be deemed procompetitive at the motion-to-dismiss stage. In fact, some of the procompetitive arguments made by the NCAA, if supported by evidence, could lead to a finding that the Bylaws are reasonable restrictions on trade. The district court did not reach the

issue of whether the NCAA Bylaws were an unreasonable restriction on trade, but rather held that plaintiffs did not—and could not—allege a relevant market cognizable under the Sherman Act. As we have made clear, we disagree that plaintiffs *could not* have alleged a relevant cognizable market, but we ultimately conclude that plaintiffs *did not* identify such a market in their complaint, *see infra* Part C, and that the district court's dismissal was justified.

## C.  Adequacy of Plaintiffs' Complaint

As already noted, naked price and output controls can obviate the need for a detailed market analysis in a Sherman Act case, *Bd. of Regents*, 468 U.S. at 109, but that does not eliminate the need for a relevant commercial market to exist altogether. *Apex Hosiery*, 310 U.S. at 492-93. In an area that is not obviously commercial, and thus where the Sherman Act's application is not clearly apparent, we believe it is incumbent on the plaintiff to describe the rough contours of the relevant commercial market in which anticompetitive effects may be felt, even when a quick-look approach is all that is called for. It must therefore be determined whether the actual markets allegedly identified in plaintiffs' complaint— the market for bachelor's degrees and the market for student-athlete labor—were actually identified, and if so, whether they adequately describe the relevant market on which the Bylaws may have had an anticompetitive effect. The district court held that plain-

tiffs failed to identify in their complaint either of the markets they now present, and we agree.

Plaintiffs come closest to identifying a relevant commercial market in their discussion of bachelor's degrees, but we nonetheless conclude that the complaint falls short. Plaintiffs admit that before filing their amended complaint in the lower court, they removed two important portions from their original complaint: (1) a section heading entitled "Relevant Market," and (2) a sentence stating that "bachelor's degrees from accredited colleges and/or universities constitute a distinct product market." It is clear, therefore, that they believed a relevant market need not be identified or they attempted to hedge their bets by keeping their market allegations vague. Plaintiffs' complaint did state that "NCAA member institutions compete with each other to attract and enroll highly skilled athletes to their institution for obtaining bachelor's degrees," which at least suggests the existence of *some* market, but the confines of that market are far too unclear. For instance, it is not apparent whether plaintiffs believe that the Bylaws affect an overall market for bachelor's degrees, which would impact scholarship athletes and non-athletes alike, or some subsidiary market that only concerns athletes attempting to obtain educational degrees in exchange for athletic services. This may seem like nitpicking, but if a Sherman Act claim of this nature progresses past the quick-look stage and enters a full-fledged Rule of Reason analysis, the scope of the market becomes of central importance.

Moreover, even if we deemed plaintiffs' complaint to put the NCAA on sufficient notice of the relevant market affected by the Bylaws, we would still have doubts about plaintiffs' ability to survive a motion to dismiss. As mentioned above, the customer base in a product market for bachelor's degrees would include many more people than scholarship athletes. Bachelor's degrees are issued to literally thousands of people, only a small portion of which are scholarship athletes, and an even smaller portion of which are athletes whose scholarships were not renewed. The anticompetitive impact of an NCAA bylaw would therefore likely be very minimal. Another problem with the alleged market for bachelor's degrees, which was discussed by the district court, is the fact that degrees are not automatically received or guaranteed upon payment of tuition. As many unhappy undergraduates can attest, payment of tuition does not ensure the receipt of a degree. Plaintiffs cite *Brown* in support of their proposed market, where the Third Circuit found a cognizable market for educational services provided by Ivy League colleges. 5 F.3d 658. But the difference between a market for educational services and a market for bachelor's degrees is of vital importance. A student is owed educational instruction upon payment of tuition, though what a student does with that instruction and whether that instruction leads to a degree is up to the student. A bachelor's degree, on the other hand, is not bought outright. It is the *opportunity* to earn a bachelor's degree that one pays for (or performs athletic services for, as the case may be). Thus, plaintiffs' complaint did not identify

a product market for bachelor's degrees, but even if it did, we would likely find that such a market—to the extent that it exists—is not cognizable under the Sherman Act.

The proper identification of a labor market for student-athletes, on the other hand, would meet plaintiffs' burden of describing a cognizable market under the Sherman Act. As an initial matter, labor markets are cognizable under the Sherman Act. *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332, 335-36 (7th Cir. 1967). The *Banks* majority, in dicta, opined that the market for scholarship athletes cannot be considered a labor market, since schools do not engage in price competition for players, nor does supply and demand determine the worth of student-athletes' labor. 977 F.2d at 1091. We find this argument unconvincing for two reasons. First, the only reason that colleges do not engage in price competition for student-athletes is that other NCAA bylaws prevent them from doing so. The fact that certain procompetitive, legitimate trade restrictions exist in a given industry does not remove that industry from the purview of the Sherman Act altogether. Rather, all NCAA actions that are facially anticompetitive must have procompetitive justifications supporting their existence.[8] Second, colleges do, in fact, compete for student-

---

[8] Again, this does not necessarily mean that any challenge of any NCAA bylaw will survive the motion-to-dismiss stage. Many NCAA bylaws can be deemed procompetitive "in the twinkling of an eye." *Cf. Bd. of Regents*, 468 U.S. at 109 n.39

(continued...)

athletes, though the price they pay involves in-kind benefits as opposed to cash. For instance, colleges may compete to hire the coach that will be best able to launch players from the NCAA to the National Football League, an attractive component for a prospective college football player. Colleges also engage in veritable arms races to provide top-of-the-line training facilities which, in turn, are supposed to attract collegiate athletes. Many future student-athletes also look to the strength of a college's academic programs in deciding where to attend. These are all part of the competitive market to attract student-athletes whose athletic labor can result in many benefits for a college, including economic gain.

Unfortunately for plaintiffs, nothing resembling a discussion of a relevant market for student-athlete labor can be found in the amended complaint. Indeed, the word labor is wholly absent. Plaintiffs claim that they "allege[d] that there was 'no practical alternative' available for students wishing to pursue an education in exchange for their playing ability," but the paragraph that they cite to in their amended complaint explains the lack of "practical alternatives" for colleges wanting to field teams outside of the NCAA's framework, not the lack of "practical alternatives" for student-athletes. Plaintiffs appear to have made the strategic decision to forgo identifying a specific relevant market. Whatever

---

[8] (...continued)

(quoting P. Areeda, *The "Rule of Reason" in Antitrust Analysis: General Issues* 37-38 (Federal Judicial Center, June 1981)).

the reasons for that strategic decision, they cannot now offer post hoc arguments attempting to illuminate a buried market allegation. We therefore affirm the district court's dismissal of plaintiffs' claims.

### D. Dismissal with Prejudice

The district court's denial of plaintiffs' request to amend their complaint is reviewed for abuse of discretion, *Stanard*, 658 F.3d at 797, which is a "heavy burden." *Jackson v. Bunge Corp.*, 40 F.3d 239, 246 (7th Cir. 1994). Under Rule 15(a) of the Federal Rules of Civil Procedure, a complainant may amend his complaint as a matter of course in response to a motion to dismiss, but any subsequent amendments can only be made with consent of the opposing party or the court's leave. We have stated that a district court is not required to grant such leave when a plaintiff has had multiple opportunities to state a claim upon which relief may be granted. *Emery v. Am. Gen. Finance, Inc.*, 134 F.3d 1321, 1322-23 (7th Cir. 1998). By our count, plaintiffs had three opportunities to identify a relevant market in which the NCAA allegedly committed violations of the Sherman Act. Plaintiffs obviously could have established a relevant market from the outset, but they also had the opportunity to amend their complaint and include an identification of a cognizable market after the full briefing and argument of the NCAA's motion to dismiss in the California district court. Further, plaintiffs actually took advantage of their ability to amend their complaint in the Indiana district court, yet even after confronting

the NCAA's claim that a relevant market had not been identified, they still did not include a clear identification of the market in which the NCAA allegedly acted in an anticompetitive manner. Further, "[i]t is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss, nor can it be amended by the briefs on appeal." *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989). We therefore cannot find that the district court abused its discretion in dismissing plaintiffs' claims with prejudice.

## III. Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court.