In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-1711

PETER DEPPE, on behalf of himself
and all others similarly situated,

*Plaintiff-Appellant*,

*v.*

NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for
the Southern District of Indiana, Indianapolis Division.
No. 1:16-cv-00528-TWP-DKL — **Tanya Walton Pratt**, *Judge*.

_____

ARGUED SEPTEMBER 13, 2017 — DECIDED JUNE 25, 2018

_____

Before BAUER, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. This case raises an antitrust challenge to the NCAA's[1] "year in residence" rule, which requires student-athletes who transfer to a Division I college to

_____

[1] National Collegiate Athletic Association.

wait one full academic year before they can play for their new school. A Division I football player filed a class-action lawsuit alleging that the rule is an unlawful restraint of trade in violation of § 1 of the Sherman Act. The district court dismissed the suit on the pleadings.

We affirm. The year-in-residence requirement is an eligibility rule clearly meant to preserve the amateur character of college athletics and is therefore presumptively procompetitive under *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984), and *Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012).

## I. Background

The case comes to us from a dismissal on the pleadings, *see* FED. R. CIV. P. 12(b)(6), so we take the following factual account from the complaint, accepting the allegations as true. Peter Deppe was a star punter in high school, and several schools recruited him to play college football. He chose Northern Illinois University ("NIU"), a Division I school, and enrolled in June 2014 as a preferred walk-on. In other words, NIU invited him to join the football team but did not offer him an athletic scholarship. Deppe decided to "red shirt" his first year; this meant that he practiced with the team during the 2014 season but did not compete, and the clock did not run on his four years of NCAA athletic eligibility.

Shortly after Deppe enrolled, an NIU football coach told him that he would start receiving an athletic scholarship in January 2015. That coach soon left NIU, however, and the head football coach later informed Deppe that he would not receive the scholarship after all. Sometime in 2015 NIU

signed another punter, reducing Deppe's chances of getting playing time or receiving an athletic scholarship, so in the fall of 2015 he started shopping around for a new football program.

The University of Iowa, another Division I school, was interested. Coaches at Iowa told Deppe they wanted him to join the team if he would be eligible to compete during the 2016–2017 season. Deppe's parents asked the NCAA about their son's eligibility to play. The NCAA responded that under its year-in-residence rule, Deppe would be ineligible to compete for one year following his transfer.

The year-in-residence bylaw appears in the eligibility section of the *NCAA Division I Manual*. It provides:

> **14.5.5.1 General Rule.** A transfer student from a four-year institution shall not be eligible for intercollegiate competition at a member institution until the student has fulfilled a residence requirement of one full academic year (two full semesters or three full quarters) at the certifying institution.

*NCAA Division I Manual*, 183, http://www.ncaapublications.com/productdownloads/D118.pdf.

The NCAA permits a one-time transfer with immediate athletic eligibility in certain limited circumstances. The so-called one-time transfer exception is available to a Division I football player only if he transfers from a school in the Football Bowl Subdivision to a school in the Football Championship Subdivision with two or more seasons of athletic eligibility remaining, or if he transfers from a Football Championship school that offers athletic scholarships to a

Football Championship school that does not. *Id.*, 184–85, § 14.5.5.2.10. The exception was unavailable to Deppe because he intended to transfer from one Football Bowl school to another.

In addition, a player who transfers due to difficult personal or family circumstances or other extenuating circumstances may apply for a waiver of the NCAA's requirement that a student-athlete's four years of playing time be completed in five calendar years. *Id.*, 79, § 12.8.1; *id.*, 81, § 12.8.1.7; *id.*, 88–89, § 12.8.6. The NCAA informed Deppe that if he wanted to try to obtain a waiver, the school to which he planned to transfer would have to initiate the process on his behalf. In November 2015 the University of Iowa granted Deppe academic admission. But a few days later, Iowa football staff notified him that the team had decided to pursue another punter who had immediate eligibility and the school would not initiate the waiver process for him.

Deppe sued the NCAA on behalf of himself and a proposed class alleging that two of the Association's bylaws violate § 1 of the Sherman Act: the year-in-residence requirement, and a rule capping the number of athletic scholarships a school can grant each year. He dropped his challenge to the scholarship cap; only the year-in-residence rule remains at issue. Deppe argued that the bylaw is an unlawful restraint of trade and that student-athletes would receive more generous athletic scholarships if they could transfer more freely.

The NCAA moved to dismiss the complaint under Rule 12(b)(6), arguing that the year-in-residence bylaw is an eligibility rule and thus is presumptively procompetitive

under *Board of Regents* and *Agnew* and need not be tested for anticompetitive effect under a full rule-of-reason analysis. The district judge agreed and dismissed the case.

## II. Discussion

We review the judge's dismissal order de novo. *Tagami v. City of Chicago*, 875 F.3d 375, 377 (7th Cir. 2017). Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. To prevail in a suit alleging a violation of § 1, the plaintiff must prove three elements: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Agnew*, 683 F.3d at 335 (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)). This case centers on the second element—specifically, whether the NCAA's year-in-residence bylaw is an unreasonable restraint of trade.

The Supreme Court considered the antitrust implications of NCAA regulations in *Board of Regents*. The case raised a Sherman Act challenge to the Association's restrictions on televising college football games. 468 U.S. at 91–92. The details are not important here; for our purposes, it's enough to note that the Court found the restrictions unlawful under § 1 of the Act. *Id.* at 120. Along the way to that holding, the Court had this to say about antitrust challenges to the NCAA's bylaws more generally:

> It is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive

> because they enhance public interest in inter-
> collegiate athletics. The specific restraints on
> football telecasts that are challenged in this
> case do not, however, fit into the same mold as
> do rules defining the conditions of the contest,
> the eligibility of participants, or the manner in
> which members of a joint enterprise shall share
> the responsibilities and the benefits of the total
> venture.

*Id.* at 117. The Court closed its decision by observing that "[t]he NCAA plays a crucial role in the maintenance of a revered tradition of amateurism in college sports" and "needs ample latitude" to play that role, and that "the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act." *Id.* at 120.

In *Agnew* we read this language from *Board of Regents* to mean that although the Sherman Act applies to the NCAA, "most [of the Association's] regulations will be a 'justifiable means of fostering competition among amateur athletic teams[]' and are therefore procompetitive." 683 F.3d at 341 (quoting *Bd. of Regents*, 468 U.S. at 117). We also understood these passages as "a license to find certain NCAA bylaws that 'fit into the same mold' as those discussed in *Board of Regents* to be procompetitive … at the motion-to-dismiss stage" without the need for analysis under the rule-of-reason framework. *Id.* (internal citation omitted) (quoting *Bd. of Regents*, 468 U.S. at 117, 110 n.39). Accordingly, we held that "the first—and possibly only—question to be answered when NCAA bylaws are challenged is whether the NCAA

regulations at issue are of the type that have been blessed by the Supreme Court, making them presumptively procompetitive." *Id.*

*Agnew* involved a challenge to the NCAA's scholarship cap and its prohibition of multiyear scholarships. *Id.* at 332. Extrapolating from *Board of Regents*, we distilled the following legal standard for determining whether a § 1 challenge in this context may go forward or should be dismissed on the pleadings: an NCAA bylaw is presumptively procompetitive when it is "clearly meant to help maintain the 'revered tradition of amateurism in college sports' or the 'preservation of the student-athlete in higher education.'" *Id.* at 342–43 (quoting *Bd. of Regents*, 468 U.S. at 120). On the other hand, "if a regulation is not, on its face, helping to 'preserve a tradition that might otherwise die,'" no such presumption is warranted. *Id.* at 343 (quoting *Bd. of Regents*, 468 U.S. at 120).

Importantly here, we also explained that "[m]ost—if not all—eligibility rules … fall within the presumption of procompetitiveness" established in *Board of Regents*. *Id.* After all, "the Supreme Court explicitly mentioned eligibility rules as a type that 'fit[s] into the same mold' as other procompetitive rules." *Id.* (alteration in original). And because eligibility rules "define what it means to be an amateur or a student-athlete," they are "essential to the very existence of the product of college football." *Id.*

The rules challenged in *Agnew* did not govern athletic eligibility or otherwise "fit into the same mold" of the presumptively procompetitive regulations mentioned in *Board of Regents. Id.* at 344–45. But the absence of a procompetitive presumption did "not equal a finding that [the rules] are

anticompetitive;" rather, it simply meant that they could not be presumed procompetitive at the pleadings stage. *Id.* at 345. So we moved to the next step in the § 1 analysis and determined that the complaint failed to identify a relevant cognizable market and affirmed the dismissal of the suit on that basis. *Id.* at 345–47.

Unlike the bylaws at issue in *Agnew*, the year-in-residence requirement is plainly an eligibility rule. It appears in the eligibility section of the *NCAA Division I Manual*. On its face, it governs a transfer student's eligibility for intercollegiate athletic competition. In particular, the bylaw suspends a transfer student's athletic eligibility until the student has spent one full academic year at his new college.

Deppe insists that the year-in-residence rule does not "fit within the contours of a traditional eligibility bylaw." On the contrary, the rule falls neatly in line with other rules courts have characterized as eligibility rules. In *Agnew* we gave the example of a class-attendance requirement to explain why eligibility rules are entitled to a procompetitive presumption. We said: "There may not be such a thing as a student-athlete, for instance, if it was not for the NCAA rules requiring class attendance, and thus no detailed analysis would be necessary to deem such rules procompetitive." *Id.* at 343 (internal quotation marks and citation omitted). Bylaws that have been classified as eligibility rules include: a bylaw revoking a student-athlete's eligibility to compete if he enters the professional draft or hires a professional agent, *Banks v. NCAA*, 977 F.2d 1081, 1082–83 (7th Cir. 1992); a rule allowing the suspension of a college football program for illicitly compensating players beyond scholarships, *McCormack v. NCAA* 845 F.2d 1338, 1343 (5th Cir. 1988); and a bylaw

making student-athletes ineligible to compete at a graduate school different from their undergraduate institution, *Smith v. NCAA*, 139 F.3d 180, 186 (3d Cir. 1998), *vacated on other grounds by NCAA v. Smith*, 525 U.S. 459 (1999). We have no difficulty concluding that the year-in-residence bylaw is an eligibility rule.

As we've noted, most NCAA eligibility rules are entitled to the procompetitive presumption announced in *Board of Regents* because they define what it means to be a student-athlete and thus preserve the tradition and amateur character of college athletics. *Agnew*, 683 F.3d at 343. Deppe has not persuaded us that the year-in-residence requirement is the rare exception to this general principle. Indeed, the complaint alleges that Division I football student-athletes would transfer more often if not for the year-in-residence rule. Without it student-athletes could be "traded" from year to year like professional athletes. A college player could begin the season playing for one school and end the season playing for its rival. Uninhibited transfers with immediate eligibility to play would risk severing the athletic and academic aspects of college sports, threatening the character of intercollegiate athletics. The year-in-residence rule guards against that risk and thus is "clearly meant to help maintain the 'revered tradition of amateurism in college sports.'" *Id.* at 342 (quoting *Bd. of Regents*, 468 U.S. at 120).

Deppe points to the exceptions and the possibility of a waiver of the Association's five-year rule, arguing that if these forms of relief are available, then the year-in-residence requirement is actually unnecessary to the survival of college football. This argument is a nonstarter. To begin, the test under *Agnew* is not whether college athletics could survive

without this bylaw, but rather whether the rule is clearly meant to help preserve the amateurism of college sports. And scrutinizing the NCAA's bylaws as Deppe suggests conflicts with the Supreme Court's admonition in *Board of Regents* that the NCAA needs "ample latitude" to preserve the product of college sports. 468 U.S. at 120. That the NCAA allows *some* avenues for relief does not suggest that the year-in-residence requirement is aimed at an objective other than the maintenance of the amateur character of the college game. Instead it suggests that the NCAA is willing to allow players certain flexibility where doing so will not damage the product of college football.

Next, Deppe argues that the NCAA enforces the year-in-residence requirement for economic reasons and not to preserve the product of college football. He asks us to infer an economic motive from the fact that the one-time transfer exception is unavailable to most Division I football, basketball, and ice-hockey players—the highest-revenue sports programs in the NCAA. This argument ignores the innocent explanation that these are precisely the athletes who are most vulnerable to poaching. Without transfer restrictions, the players in these high-revenue sports could be traded like professional athletes.

Deppe also argues that because the year-in-residence requirement impedes transfers, it lowers the administrative costs associated with player movement, including recruiting and retention expenditures. That is, schools are saving money they would otherwise need to spend on more generous scholarships to tempt their student-athletes to stay, as well as money necessary to recruit and train new players to replace those who leave. But the fact that colleges may save

money as a consequence of the year-in-residence require-ment does not mean that the bylaw is fundamentally aimed at containing costs rather than preserving the amateur character of college football.

Last, Deppe argues that at bottom, the year-in-residence rule serves economic interests because it "preserves the hegemony of the top 'Power 5' conferences"—the most powerful group of schools in the NCAA. He asserts that these schools recruit the most talented high-school athletes and that the year-in-residence rule prevents those student-athletes from transferring to less powerful schools. But the rule impedes transfers in both directions. Without it, the "Power 5" schools could poach rising stars from smaller schools, which would risk eroding the amateur character of the college game.

In sum, the year-in-residence rule is, on its face, a pre-sumptively procompetitive eligibility rule under *Agnew* and *Board of Regents.* Accordingly, a full rule-of-reason analysis is unnecessary. Deppe's Sherman Act challenge to the NCAA's year-in-residence bylaw fails on the pleadings.

AFFIRMED.